[Civ. No. 52606. Second Dist., Div. Three. Aug. 3, 1978.]

LAUREL HILLS HOMEOWNERS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
CITY COUNCIL OF THE CITY OF LOS ANGELES et al.,
Defendants and Appellants;
8941 MULHOLLAND DRIVE CORPORATION,
Real Party in Interest and Respondent.

516

COUNSEL

Charles F. Palmer, Paul F. Cohen and Antonio Rossman for Plaintiffs and Appellants.

Burt Pines, City Attorney, Claude E. Hilker and Jerome Montgomery, Assistant City Attorneys, for Defendants and Appellants.

Latham & Watkins and George A. Rice for Real Party in Interest and Respondent.

## OPINION

**COBEY, Acting P. J.**—Petitioners, Laurel Hills Homeowners Association, Briarcliff Improvement Association, Susan Tyler, and Marvin E. Jacobs, appeal from a judgment denying their petition for a writ of mandate that would have required respondents, the City Council of Los Angeles, the city planning commission and the city advisory agency, to vacate their approvals of a subdivision (tentative tract 29033) proposed by the developer, 8941 Mulholland Drive Corporation, and extensively modified by the city as a condition of approval.[1] The city has cross-appealed. Both the appeal and cross-appeal lie. (Code Civ. Proc., §§ 904.1, subd. (a), 1094.5, subd. (f).)

Petitioners' position, as briefed, is that the city's approval of this subdivision must be set aside because of the city's failure to comply with certain provisions added to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), which became effective in 1977.[2] These provisions are found in sections 21002 and 21002.1.[3] The fundamental requirement of these added provisions is that of section 21002 that public agencies may not approve proposed projects where there are

---

[1] The trial court concluded as a matter of law that petitioner Jacobs had standing to petition for the requested extraordinary relief. It expressly made no determination regarding the standing of the other petitioners. It did find, though, that the unincorporated associations are composed of owners of real property located in the vicinity of the subdivision.

[2] All section references hereafter, with the exception of part V of this opinion, are to the Public Resources Code unless otherwise indicated.

[3] The pertinent portions of these sections read, and always have read:

Section 21002. "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make

available feasible mitigation measures or feasible alternatives which would substantially lessen the significant environmental effects of the projects. Petitioners argue that in this case the environmental impact report (EIR) identified, as required by section 21002.1, such alternatives; but that the city failed to find an environmentally superior alternative, identified in the environmental impact report—namely, the 63-unit cluster-condominium project, infeasible.

Petitioners' position raises two preliminary issues. The first is the applicability of these 1977 provisions to administrative proceedings completed in 1976. The second is whether these provisions required, as a condition precedent to municipal approval of the subdivision as modified, a determination by the city of the infeasibility of environmentally superior alternative projects identified in the environmental impact report where the city had already determined that suitable mitigation measures imposed by it would reduce the remaining significant adverse environmental effects of the subdivision to an acceptable level as hereinafter defined. We will now consider these issues.

I

Preliminary Issues

A. *Sections 21002 and 21002.1 Apply*.
   *Fully to the Proceedings Before Us*[4]

The trial court concluded as a matter of law that sections 21002 and 21002.1 were declaratory of preexisting law as expressed in *Friends of*

---

infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one of more significant effects thereof."

Section 21002.1. policy "In order to achieve the objectives set forth in Section 21002, the Legislature finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to the provisions of this division:

"(a) The purpose of an environmental impact report is to identify the significant effects of a project on the environment, to identify alternatives to the project, and to indicate the manner in which such significant effects can be mitigated or avoided.

"(b) Each public agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so.

"(c) In the event that economic, social, or other conditions make it infeasible to mitigate one or more significant effects of a project on the environment, such project may nonetheless be approved or carried out at the discretion of a public agency, provided that the project is otherwise permissible under applicable laws and regulations. . . ."

[4]These two sections are a part of Statutes 1976, chapter 1312, sections 1 and 1.5. This chapter took effect on January 1, 1977. (Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)

*Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263, fn. 8 [104 Cal.Rptr. 761, 502 P.2d 1049]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 203 [139 Cal.Rptr. 396]; and *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584 [122 Cal.Rptr. 100].

■ We agree generally with this conclusion and therefore hold that these two sections apply fully to the proceedings before us. We may so hold because the Legislature clearly left this question of the possible retroactive effect of these sections up to the courts. Section 21 of the final version of the bill (Assem. Bill No. 2679 (1975-1976 Reg. Sess.)), in which these sections originated, reads: "The Legislature declares that it makes no finding whether sections 21002, 21002.1 and 21082.1, as added to the Public Resources Code act, are, or are not, declaratory of existing law."

We so hold because of the following relevant language in the just-mentioned *Friends of Mammoth* footnote 8. "Obviously if the adverse consequences to the environment can be mitigated, or if feasible alternatives are available, the proposed activity, such as the issuance of a permit, should not be approved. In making these determinations concrete concepts, not mere aphorisms or generalities, must be considered." This language, reasonably construed, embodies essentially the substantive requirements articulated in sections 21002 and 21002.1.

B.  *The Alternative Nature of Mitigation Measures and Project Alternatives*

In the aforementioned *Friends of Mammoth* v. *Board of Supervisors,* *supra,* 8 Cal.3d at page 259, our Supreme Court concluded that the Legislature intended CEQA to be interpreted "in such manner as to afford the fullest possible protection to the environment *within the reasonable scope of the statutory language.*" (Italics added.) Petitioners argue that this means that in this case the city violated CEQA because it did not find that specific conditions made infeasible the environmentally superior 63 unit cluster-condominium project identified in the environmental impact report.

■ We take the view that such a finding was unnecessary under the circumstances of this case on the basis of the following rationale. It is true

that an environmental impact report must identify both feasible mitigation measures and feasible project alternatives. (§§ 21002, 21002.1, subds. (a), (b).) But if the feasible mitigation measures substantially lessen or avoid generally the significant adverse environmental effects of a project, the project may be approved without resort to an evaluation of the feasibility of various project alternatives contained in the environmental impact report. Furthermore, if economic or social conditions make infeasible the mitigation of one or more significant adverse environmental effects of a project, such project may nevertheless be approved provided the project is otherwise permissible under applicable laws and regulations. (§ 21002.1, subd. (c).)

As we see it, the fundamental purpose of CEQA is to prevent avoidable damage to the environment from projects. (See § 21000, subd. (g).) If this end can be accomplished essentially by the imposition of feasible mitigation measures alone, there is no need to resort to a consideration of the feasibility of environmentally superior project alternatives identified in the environmental impact report. This apparently is the reason why (aside from their joint inclusion in environmental impact reports) mitigation measures and project alternatives are always mentioned together in the alternative rather than in the conjunctive in the two sections of CEQA upon which we concentrate in this opinion. (See §§ 21002, 21002.1, subd. (a).) Otherwise the fundamental purpose of CEQA would become the mandatory choice of the environmentally best feasible project. ■ We believe to the contrary that under the *Friends of Mammoth* yardstick, which we quoted above, the appropriate public agency may approve a developer's choice of a project once its significant adverse environmental effects have been reduced to an acceptable level—that is, all avoidable significant damage to the environment has been eliminated and that which remains is otherwise acceptable. In other words, CEQA does not mandate the choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has reduced environmental damage from a project to an acceptable level.

## II

### FACTS

Petitioner Jacobs owns real property in the community of Briarcliff within the city, which is in the immediate vicinity of the proposed subdivision.

The developer is the owner of approximately 126 acres in the Santa Monica mountains located east of Coldwater Canyon Drive and north of Mulholland Drive. On August 18, 1975, it initiated the administrative proceedings before us by filing an environmental assessment form with the environment review section of the city's planning department for a project designated Tentative Tract 29033, under which the aforementioned 126 acres would be subdivided into 124 building lots for single family dwelling units.

The city planning department performed an initial study of the environmental impact of the proposed project and found that the project might have a significant effect on the environment. Under section 21151 of CEQA, this finding made necessary the preparation of an EIR. The city then prepared in both draft and final versions an EIR and the trial court has found that both versions fully complied with CEQA.[5]

Among the beneficial impacts of the project identified in the EIR were conformity to the single family character of the surrounding area, conformity to the general plan density, a possibility of generation of public revenues, a large construction payroll, an increase in consumer purchasing power, and provision of additional housing. Similarly, among the adverse impacts of the project so identified were aesthetics, fire hazard, and traffic. As to these adverse impacts mitigation measures were recommended in the EIR. The EIR also identified eight alternative projects (including a nonproject alternative) to the proposed project based on lower density formulas and cluster—that is, condominium-type projects. The EIR concluded that environmentally the 63-unit cluster alternative was superior, but did not make any recommendation as to the most desirable alternative when economic, social, political, and other factors were taken into account.

On June 2, 1976, the city's Advisory Agency of Los Angeles began a lengthy public hearing on Tentative Tract 29033. Thereafter, on June 16, 1976, the advisory agency issued a report approving the subdivision. Prior to approval by the advisory agency, the proposed subdivision was reviewed by the affected city departments including building and safety, planning, recreation and parks, traffic, water and power, and engineering. The advisory agency report contained extensive conditions of approval and included some of the recommendations of the city departments

---

[5]The draft report was incorporated into the final report.

reviewing the proposed subdivision as well as most of the recommendations of the EIR in mitigation of the adverse impacts on the environment. The conditions restricted maximum development to 95 single-family lots, required a redesign of the subdivision to minimize grading and to increase open space, and imposed mitigation measures to lessen substantially or avoid adverse environmental impacts of the subdivision as initially proposed.

The advisory agency report also contained express findings of fact, made pursuant to Government Code sections 66474.60 and 66474.61 of the Subdivision Map Act (Gov. Code, § 66410) that: (1) the proposed map was consistent with applicable general and specific plans; (2) the design and improvement of the proposed subdivision was consistent with applicable general and specific plans; (3) the site was physically suitable for the proposed type of development; (4) the site was physically suitable for the proposed density of the development; (5) the design of the subdivision and the proposed improvements were not likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat; (6) the design of the subdivision and the proposed improvements were not likely to cause serious public health problems; and (7) the design of the subdivision and the proposed improvements would not conflict with easements acquired by the public at large, for access through or use of property within the proposed subdivision. These conclusionary findings were supported by almost six pages of detailed findings.

Even though the advisory agency reduced the subdivision to 94 lots from the original proposal of 124 lots, the advisory agency report did not make any findings of fact with respect to any alternative project. The advisory agency report concluded with a statement of overriding considerations which reads:

"The Advisory Agency recognizes that this project has some adverse environmental effects such as cumulative generation of traffic and the alteration of the natural topography of the site. The Advisory Agency finds the traffic generated from this project will not be significant. The regional traffic problem is an issue of Citywide concern to which no adequate solution currently exists.

"This subdivision will provide construction employment in excess of $14 million, increase local consumer purchasing power by nearly $3

million per year, and provide an additional 95 units of single family housing compatible with the residential character of the surrounding area. Moreover, in providing private streets, security for future residents by controlling ingress and egress, and a homeowner's association charged with maintenance of the streets and open space areas, the project may provide more public revenues to the City than tax revenues absorbed.

"The subdivider's offer to dedicate approximately 28 acres for public park and recreational purposes in addition to the .96 acres of additional parkland dedicated by the project will be of substantial benefit to the City. In addition this subdivision will provide 32 additional acres of open space to be retained as private open space and in a natural state.

"The construction of the viewsite and the Mulholland Scenic Parkway amenities will be the first step in implementing the parkway concept and will increase opportunity for the public to enjoy this portion of the Santa Monica Mountains.

"This development will improve the movement of traffic through the Mulholland Drive—Coldwater Canyon Drive intersection. This construction, in accordance with the Bureau of Engineering design, will provide safer turning movement from westbound Mulholland Drive to southbound Coldwater Canyon Drive.

"The trade-offs involved in permitting future development in the Santa Monica Mountains have been examined with respect to the proposed project and the Advisory Agency has determined after reviewing all aspects of this development that there will be a net beneficial effect to the citizens of Los Angeles. Therefore, it is the opinion of the Advisory Agency that the project should be approved as a single-family residential development.

"This statement of overriding considerations shall be a part of the Final Environmental Impact Report for Tentative Tract 29033."

Jacobs appealed the decision of the advisory agency on June 30, 1976, to the city's planning commission which met on July 29, 1976, to hear the appeal. The planning commission denied the appeal after an extensive hearing. Jacobs then appealed the decision of the planning commission to the city council. This appeal was initially heard by the city council planning committee which held a public hearing and then voted to

sustain the approval. A de novo public hearing was then held before the full city council. The city council voted 10-1 to deny the appeal and sustain the advisory agency's approval of the subdivision with one relatively minor modification.[6]

On March 18, 1977, petitioners filed their petition for a writ of mandate that would order the municipal respondents to vacate and reverse their decisions which approved Tentative Tract 29033. Among other things, the trial court concluded in these administrative mandamus proceedings that: (1) the city complied with sections 21002 and 21002.1 in that substantial evidence supported the city's determination that the subdivision after imposition of mitigation measures as tract conditions would not have significant adverse environmental effects, and (2) in the city's judgment the social, economic, and environmental benefits of Tentative Tract 29033 outweighed any adverse environmental effects.

## III

### OUR CONCLUSIONS

We agree in part with the foregoing two legal conclusions of the trial court and therefore will affirm, generally, its judgment.

More particularly we conclude that on the basis of the findings of the advisory agency, which the council adopted, the city's approval of the subdivision as modified was authorized by sections 21002 and 21002.1, subdivision (c). In the proceedings before us the city merely gave effect to the last sentence of section 21002, which reads: "The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."[7] In sum, to our way of thinking, the city's approval of the subdivision, as modified, is supported by substantial evidence in the light of the whole record. (See § 21168.)

---

[6]This was that the westerly 50 feet of the subdivision along and above Mulholland Drive be restricted against (1) any tennis courts, (2) any structure over 6 feet in height.

[7]The findings of the advisory agency, which the council adopted, appear to us to satisfy the fundamental requirement of *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12], of bridging the analytic gap between the raw evidence and the city's ultimate decision herein—the approval of the subdivision as modified. These findings undoubtedly could have been clearer, but on the whole they adequately inform interested parties and reviewing courts of the bases for the

IV

THE LAW APPLIED TO THIS CASE

A. *The Efficacy and Feasibility*
   *of the Mitigation Measures*

The only two adverse environmental effects remaining after the imposition of feasible mitigation measures expressly and specifically mentioned in the city's advisory agency's already quoted statement of overriding considerations were cumulative generation of traffic and the alteration of the natural topography of the site.[8]

The advisory agency, however, expressly found in this statement that the traffic generated by the subdivision will not be significant (presumably in volume) and that the regional traffic problem was an issue of citywide concern for which no adequate solution currently existed.

The detailed findings generally support these ultimate findings of comparative insignificance and infeasibility. (See § 21002.) They state that 80 percent of the traffic using Coldwater Canyon Drive is through traffic rather than locally originated traffic and that traffic generated within the subdivision would increase peak-hour traffic volume less than 2 percent. They pointed out that one of the mitigation measures imposed was the redesign of the intersection of Mulholland Drive and Coldwater

---

administrative action taken. (See *San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584, 596; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 731 [135 Cal.Rptr. 588].)

[8]At oral argument petitioners broadened their attack in this court on the city's approval of the subdivision, as modified, to include a claim of noncompliance with the Mulholland scenic parkway ordinance. (Los Angeles Municipal Code, § 17.05, subd. (S).) We think that this particular attack comes too late. (See *Johns* v. *Baender* (1919) 40 Cal.App. 790, 793 [182 P. 55]; *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625, 636 [57 P.2d 215].) But we nevertheless note that during the city council proceedings under review, a deputy city attorney thrice informally advised the council that this subdivision, as modified, complied with this ordinance, the basic requirement of which is reasonable protection of the scenic corridor.

We note further that one portion of the detailed findings of the advisory agency deals with the consistency of the subdivision, as modified, with the Mulholland scenic parkway plan, and that these findings include a statement to the effect that the advisory agency believes that the mitigation measures imposed will protect future users of the Mulholland scenic corridor from the intrusion into their line of sight of any new structures in the subdivision and will retain the natural scenic views from Mulholland Drive.

Canyon Drive—presently a serious traffic hazard. They noted that the inadequacy of traffic circulation within the Santa Monica mountains is really an areawide problem—one which inferentially cannot be solved on a piecemeal basis. (See § 21002.1, subd. (c).)

According to the detailed findings of the advisory agency, approximately 1.6 million cubic yards of grading will be required for this subdivision as approved, but the temporary visual impact of this grading will be substantially mitigated by the numerous stringent conditions of approval. These include contoured grading, short and long term erosion control, and correction of geological hazards. Furthermore, the grading operations themselves will be closely controlled with provision for rapid replanting of the graded slopes. Finally, the subdivision, as approved, will contain approximately 67 acres of open space, including a specially constructed public viewsite.

V

### PETITIONERS' MOTION TO TAX THE COSTS OF THE DEVELOPER SHOULD HAVE BEEN HEARD ON ITS MERITS

On August 19, 1977, the trial court, in a lengthy minute order, denied petitioners' petition for a writ of mandate, indicated the basis for this determination, and directed counsel for the developer (the real party in interest) to prepare and serve a proposed judgment and findings of fact and conclusions of law as well, if the same were timely requested. On October 13, 1977, the developer filed its cost bill in the amount of $1,775.50. It had served a copy of this bill by mail upon petitioners on the immediately preceding day. On November 2, 1977, the trial court filed its decision—its findings of fact and conclusions of law (see *Martin Sch. of Aviation* v. *Bank of America* (1957) 48 Cal.2d 689, 695 [312 P.2d 251]; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556, 566 [118 Cal.Rptr. 687])—and the following day the trial court entered its judgment denying the requested writ of mandate. On November 16, 1977, petitioners moved to tax the developer's costs. On November 30, 1977, the trial court denied the motion as untimely under Code of Civil Procedure section 1033 and as insufficiently supported under Code of Civil Procedure section 473.[9]

---

[9]All section references hereafter in this part are to the Code of Civil Procedure unless otherwise indicated.

Section 1033 directs the prevailing party to serve upon its adversary and file its cost bill "at any time after the verdict or decision of the court, and no later than 10 days after the entry of the judgment." This section further provides that a party dissatisfied with costs claimed may within 10 days after the service of a copy of the cost bill upon it, file a motion to have the same taxed. Section 1012 authorizes generally service by mail and section 1013, with specific exceptions here immaterial, extends the time for an act to be done thereafter by the adverse party five days after service by mail if the place of address is, as here, within the State of California.

■ The developer's cost bill, though not a nullity (*Parker* v. *City of Los Angeles, supra,* 44 Cal.App.3d at p. 566), was filed prematurely. If it had been filed within the period that it should have been filed, petitioners' motion to tax costs would have been timely. We will therefore treat petitioners' motion as if it had been timely filed, modify the judgment appropriately,[10] and direct the trial court to hear the motion and to take whatever further proceedings with respect to the developer's cost bill as appear to be appropriate.

VI

DISPOSITION

The judgment under appeal is modified by striking therefrom the award of costs to the real party in interest in the sum of $1,775.50. As so modified, the judgment is affirmed. Costs on appeal are awarded respondents, including the real party in interest. The case is remanded to the trial court, however, for a hearing of petitioners' motion to tax the trial costs of the real party in interest and for such further proceedings respecting such subject matter as may thereafter be appropriate. The writ of supersedeas heretofore issued in this case is terminated upon this decision becoming final as to this court.

Allport, J., and Potter, J., concurred.

The petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied September 27, 1978. Bird, C. J., was of the opinion that the petition should be granted.

---

[10] The city's cost bill was filed at the proper time and has not been challenged.