[Civ. No. 18996. Fourth Dist., Div. One. June 22, 1981.]

SAN DIEGO TRUST AND SAVINGS BANK, as Executor, etc., et al., Plaintiffs and Respondents, v.
FRIENDS OF GILL, Defendant, Cross-complainant and Appellant.
CITY OF SAN DIEGO, Cross-defendant and Respondent.

COUNSEL

Janet Motley, Gene Erbin, Mike Goldstein and Richard J. Wharton for Defendant, Cross-complainant and Appellant.

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, Mark I. Weinberger and Timothy R. Patterson, Deputy Attorneys General, as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

McDonald, Hecht & Worley and Donald R. Worley for Plaintiffs and Respondents.

John W. Witt, City Attorney, and John K. Riess, Deputy City Attorney, for Cross-defendant and Respondent.

OPINION

COLOGNE, Acting P. J.—San Diego Trust and Savings Bank (Bank) as executor of the estate of Tom Kelly, deceased, and Kevin and Kathleen Kelly, coadministrators of the estate of Helen Kelly, deceased (referred to collectively as the Kellys), are the owners of certain real property on which there was a single-family residence known as Melville/Klauber House.[1] This building was designed by architect Irving Gill and listed as a local and national historical site on both the City Historical Site Register and the National Register of Historical Places.

On November 14, 1977, the Kellys applied to the City of San Diego (City) for issuance by the City Building Inspection Department of a permit to demolish the House in order to develop the property. Pursuant to the provisions of San Diego Municipal Code section 26.02, dealing with the creation and duties of the San Diego Historical Site Board (Board), and particularly San Diego Municipal Code section 26.02E,[2] dealing with demolition, alteration or removal of historical sites, the application was referred to the Board for consideration.

---

[1] This property described as Lots J, K and L of Block 355, Horton's Addition, City of San Diego, more commonly referred to as 3060 Sixth Avenue, San Diego, California, is referred to as the House in this opinion.

[2] Section 26.02E of the San Diego Municipal Code reads:
"1. No permit for the demolition, substantial alteration or removal of any building, structure or site listed in the register of historic sites shall be issued without first refer-

The Board objected to the issuance because an environmental impact report (EIR) had not been prepared. The applicants then had an EIR prepared and, after revision, submitted it to the environmental quality division of the planning department of the City. The EIR review process by the City became "final" on August 4, 1978, and on September 1, 1978, the Board again considered the application. The issuance of the

---

ring the matter to the Historical Site Board, except where the City Manager determines that demolition, removal or substantial alteration of any such building, structure or site is immediately necessary in the interest of the public health, safety or general welfare. The Building Inspection, Engineering and Community Development Departments shall notify the Historical Site Board in writing within five (5) days of any request it receives for any such permit.

"2. No person shall remove trees, plants or other major landscaping from any property designated as a historical site without the prior approval of the City Manager. The City Manager shall notify the Historical Site Board in writing of any such request within five (5) days of its receipt.

"3. The Historical Site Board shall have thirty (30) days from the date of such notification within which to object to the proposed demolition, major alteration or removal of the trees, plants or other major landscaping. The Historical Site Board shall file its objections with the City Manager or his delegate. Upon the filing of said objections, no permits shall be issued for the demolition, major alteration, or removal of said historic site for a period of not less than thirty (30) nor more than one hundred eighty (180) days. The City Manager shall notify the appropriate departments of the filing of objections by the Historical Site Board. Failure to file objections within the thirty (30) days period shall be deemed a waiver of all objections, and the permit shall be issued in due course.

"4. Upon the filing of objections, the Historical Site Board shall take such steps within the scope of its powers and duties as it determines are necessary for the preservation of the historical site. No such action shall be taken by the Historical Site Board, however, until the same has been first submitted to and approved by the City Council. At the end of the first thirty (30) days, the Historical Site Board shall report its progress to the City Council which may, upon review of the progress report, withdraw and cancel the objection to the proposed demolition, major alteration or removal, and the necessary permits shall then be issued. If at the end of the first one hundred (100) days of the aforesaid one hundred eighty (180) day period it is found that the preservation of the site, building or structure cannot be fully accomplished within the one hundred eighty (180) day period and the Historical Site Board determines that such preservation can be satisfactorily completed within an additional period not to exceed one hundred eight [sic] (180) days, the Historical Site Board may recommend to the City Council that a request for extension be granted. Such recommendation shall set forth the reasons therefor and the progress to that date of the steps taken to preserve the site. The City Council may accept such recommendation for good cause shown, and if it appears that preservation may be completed within the time requested, may grant an extension of time not to exceed one hundred eighty (180) days. No such request for extension shall be made after the expiration of the original one hundred eighty (180) day suspension period.

"5. The Historical Site Board shall have no power or right to acquire any property for or on behalf of itself or The City of San Diego, nor shall it acquire or hold any money for itself or on behalf of the City.

"6. Said Historical Site Board may adopt such rules and regulations as are necessary to carry out the purpose and intent of this section."

permit was opposed by Friends of Gill, a group dedicated to preservation of the architectural works of Irving Gill. The Board objected to the issuance and recommended a stay of the issuance up to the maximum permissible 180 days.

On October 3, 1978, the San Diego City Council (Council) heard the Board's report and referred the matter to the public facilities and recreation committee of the Council. On October 19, the committee recommended the Council direct the city manager to assist however possible to achieve a private acquisition and report to the Council within 45 days on any feasible site for relocation and potential financial arrangements. The committee also recommended the Council direct the permit be issued if the House had not been privately acquired or the Council had not acted to preserve it within a 45-day time period. On October 23, the Council voted to direct the city manager's staff to explore and develop feasible means of removing the House to another site and report back within 90 days. It further expressed its intent that, should no solution be found within that time, the demolition permit should issue.

Before the expiration of the original 180-day stay, the Board requested the Council to extend the stay. The Council extended the stay an additional 120 days and later directed another stay of 60 days or until August 27, 1979.

On April 9, the Kellys brought this action against the City, Friends of Gill and others for declaratory relief, seeking a judicial declaration of the rights of the parties under the City's code and the California Environmental Quality Act (the Act; Pub. Resources Code, § 21000 et seq.)[3] as they pertain to the House. A cross-complaint was filed by Friends of Gill.

On stipulation of the parties, a motion for summary judgment was heard in the declaratory relief action on June 6, 1979, and judgment was rendered for the plaintiffs as follows: "Based upon the pleadings, papers, stipulations, citations and arguments of counsel, it appears that the issues sought to be determined by counsel are appropriate for decision on the motions presently before the court. All discretionary functions will have been fulfilled as of the agreed date: June 27, 1979; therefore, issuance of the permit sought is a ministerial function.

---

[3]All references are to the Public Resources Code unless otherwise designated.

"Plaintiffs' motion is granted; counsel for plaintiffs shall prepare, serve and file the order." Appeal followed to this court. On October 11, an application to this court for a temporary stay was granted to October 12, in order to consider the merits of the petition. At that time, the application was denied.

In a separate action filed in August 1979, Harry Evans brought suit against the City of San Diego, Imperial Contracting Co., Inc., and San Diego Trust and Savings Bank (superior court case No. 439871), seeking a writ of mandate under Code of Civil Procedure section 1094.5. A temporary restraining order in that case resulted in a further stay on the issuance of the permit until September 12, when a hearing could be held. At that time, the trial judge denied the writ and Evans filed his notice of appeal. The Evans and Friends of Gill cases were consolidated for appeal, but Evans later withdrew his notice of appeal which, under rule 19(a), California Rules of Court, operates as a dismissal of the appeal in Evans versus the City of San Diego.

The permit was issued and the House demolished. On January 29, 1981, the parties stipulated the Bank and the Kellys had no further interest in the matter and they were dismissed as parties to the action and the appeal.

The City moved the appeal should be dismissed as moot because the demolition permit has been issued and the building removed. The owner and contractor have been relieved from further appearance so any resolution will not affect them or the property.

In a proceeding that might otherwise be deemed moot, we have discretion to resolve an issue of continuing public interest that is likely to reoccur in other cases, and such resolution is particularly appropriate when it is likely to affect the future rights of the parties before us (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]). The continuing public importance of preserving historical sites and the City's method of dealing with demolition permits require we address the issues at this time, even though our opinion will have no effect on the preservation of this historical site. The motion to dismiss is denied.

Friends of Gill and the state Office of Historic Preservation, which filed an amicus curiae brief, contend the issuance of a demolition permit of a historical site is a discretionary act making the permit-issu-

ing process a "discretionary project" subject to the Act. The City agrees with this contention. We first resolve the parties are correct in this understanding.

The Act provides a legislative declaration of intent to take all action necessary to provide the people of this state with the enjoyment of aesthetic, natural, scenic and *historic qualities* (§ 21001, subd. (b)) and requires governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality (§ 21001, subd. (f)) and consider qualitative, economic and technical factors, costs and benefits and alternatives affecting the environment (§ 21001, subd. (g)). It also declares public agencies should not approve projects if there are feasible alternatives or mitigation measures available which would substantially lessen the significant environmental effects (§ 21002). The use of an EIR is required on all discretionary projects (§ 21080; see § 21100 re contents of EIR).

Although the Act does not define discretionary, the secretary of the resources agency has adopted the following definition:

*Discretionary Project.* "Discretionary project means an activity defined as a project which requires the exercise of judgment, deliberation, or decision on the part of the public agency or body in the process of approving or disapproving a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations. A timber harvesting plan submitted to the State Forester for approval under the requirements of the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Res. Code § 4511 et seq.) constitutes a discretionary project within the meaning of the California Environmental Quality Act. § 21065 (c)." (Cal. Admin. Code, tit. 14, § 15024.)

*Ministerial Projects.* "Ministerial projects as a general rule, include those activities defined as projects which are undertaken or approved by a governmental decision which a public officer or public agency makes upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority. With these projects, the officer or agency must act upon the given facts without regard to his own judgment or opinion concerning the propriety or wisdom of the act although the statute, ordinance, or regulation may require, in some degree, a construction of its language by the officer. In summary, a ministerial decision involves only the use of fixed standards or objective mea-

surements without personal judgment." (Cal. Admin. Code, tit. 14, § 15032.)

In *Day* v. *City of Glendale* (1975) 51 Cal.App.3d 817, at pages 823 to 824 [124 Cal.Rptr. 569], when deciding whether issuance of a grading permit was ministerial or discretionary, the court said:

"CEQA must be interpreted to afford the fullest possible protection to the environment within the reasonable scope of statutory language. [Citation.] A project of mixed ministerial-discretionary character, as was the grading permit here, should be treated as a discretionary project. As was said in *People* v. *Department of Housing and Community Development*, 45 Cal.App.3d 185, 194 ..., '.... CEQA draws a line between purely ministerial and entirely discretionary projects but does not mention those having both characteristics. Statutory policy, not semantics, forms the standard for segregating discretionary from ministerial functions .... CEQA is to be interpreted to "'afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" ... So construed, section 21080 extends CEQA's scope to hybrid projects of a mixed ministerial-discretionary character; doubt whether a project is ministerial or discretionary should be resolved in favor of the latter characterization.'

"Moreover, the discretionary-ministerial designation of a project is not necessarily determinative of its environmental impact. We do not believe the Legislature intended to exclude from the ambit of CEQA any project involving, as here, cut, movement, and fill of massive sections of earth. All parties agree that the grading project will have a significant effect on the environment. The issuance of the grading permit is the only point at which the environmental impact of the project may be publicly considered before mountains are moved and 70 acres of canyon are filled."

It is apparent San Diego Municipal Code section 26.02 contemplated some ultimate discretionary act in the issuance of the permit because under its provisions the Board must investigate and confer with the responsible parties and under these powers impliedly will attempt to secure alternatives where appropriate. The code gives the Board certain authority to act, but only with the approval of the Council. It also gives an aggrieved party the right to appeal any Board action to the Council.

We find no basis to distinguish the result in *Day* dealing with issuance of a grading permit from the issuance of a demolition permit. The process of issuance of the permit to demolish a historical building involves a discretionary act and, as such, involves the panoply of duties and options under the Act.[4]

■ Friends of Gill and amicus further argue, in essence, the City's demolition ordinance and related enactments pertaining to historical sites violate the Act because they do not expressly require an EIR or empower the Council to deny a demolition permit, instead only authorizing the Board and Council to delay the ultimate issuance of the permit as a ministerial act of the City Building Inspection Department. The City disagrees with this argument. We should note in passing an EIR was prepared and filed here. There is no contention it is deficient in any way. Friends of Gill did not even request a copy be brought to us.

Pursuant to the Act, the City of San Diego adopted an environmental quality ordinance (Ord. No. 12203 N.S. now found in San Diego Mun. Code, § 69.0101 et seq.). That ordinance requires *all* City agencies give major consideration to prevent environmental damage (§ 69.0103, subd. (g)) and calls for the preparation of an EIR to identify significant effects of the project on the environment under the Act and the Administrative Code guidelines (San Diego Mun. Code, § 69.0106).[5] The procedure followed here conformed, as it must, to section 69.0106. The application for a demolition permit for a historical site was forwarded to the Board (San Diego Mun. Code, § 26.02E) and the EIR was duly prepared. The provision dealing with demolition permits must be read with the environmental quality ordinance and the Act which require an EIR be prepared for all discretionary projects which impact on the environment as would the demolition of a historical site.

---

[4]Since the authority of the City under the historic site demolition ordinance only extends to granting stays, it can be argued that the actual issuance of the permit is ministerial. Because of the discretion that must be exercised during the stay period, it would be at worst a mixed discretionary and ministerial act. In that event, the law requires it be deemed discretionary in nature (Cal. Admin. Code, tit. 14, § 15073, subd. (d); and see *Day* v. *City of Glendale, supra*, 51 Cal.App.3d 817, 823).

[5]Section 69.0106 of the San Diego Municipal Code reads:

"In order to achieve the objectives set forth in Section 69.0105 the Council, concurring with the State Legislature, finds and declares that the following policy shall apply to the use of environmental impact reports:

"A. The purpose of an environmental impact report is to identify the significant ef-

■ Friends of Gill suggests the Council believed it could act only to delay issuance of the permit since that is all the ordinance authorized. The record does not support this. The Act and the City's environmental ordinance provide for a wide range of responsibility to review, evaluate, consider and develop standards. In *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, at page 521 [147 Cal.Rptr. 842], the court said:

"As we see it, the fundamental purpose of CEQA is to prevent avoidable damage to the environment from projects. (See § 21000, subd. (g).) If this end can be accomplished essentially by the imposition of feasible mitigation measures alone, there is no need to resort to a consideration of the feasibility of environmentally superior project alternatives identified in the environmental impact report. This apparently is the reason why (aside from their joint inclusion in environmental impact reports) mitigation measures and project alternatives are always mentioned together in the alternative rather than in the conjunctive in the two sections of CEQA upon which we concentrate in this opinion. (See §§ 21002, 21002.1, subd. (a).) Otherwise the fundamental purpose of CEQA would become the mandatory choice of the environmentally best feasible project. We believe to the contrary that under the *Friends of Mammoth* yardstick, which we quoted above, the appropriate public agency may approve a developer's choice of a project once its significant adverse environmental effects have been reduced to an acceptable level—that is, all avoidable significant damage to the environment has been eliminated and that which remains is otherwise acceptable. In other words, CEQA does not mandate the choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has

fects of a project on the environment, to identify alternatives to the project, and to indicate the manner in which such significant effects can be mitigated or avoided.
"B. Each City agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so.
"C. In the event that specific economic, social, or other conditions make it infeasible to mitigate one or more significant effects of a project on the environment, such project may nonetheless be approved or carried out at the discretion of the City agency, provided that the project is otherwise permissible under applicable laws and regulations.
"D. In applying the policies of subsections B and C to individual projects, the responsibility of a City agency which is functioning as a lead agency shall differ from that of a City agency which is functioning as a responsible agency. A City agency functioning as a lead agency shall have responsibility for considering the effects, both individual and collective, of all activities involved in a project. A City agency functioning as a responsible agency shall have responsibility for considering only the effects of those activities involved in a project, which it is required by law to carry out or approve."

reduced environmental damage from a project to an acceptable level." It is apparent the specific sections of the San Diego Municipal Code dealing with demolition permits only authorize procedural delays in the issuance of the permit. The power the City possesses to grant a permit, however, necessarily includes the power not to grant. Such an act, however, could entail serious economic consequences and might be construed as an act of inverse condemnation. Restrictive zoning, leasing or purchasing are also possible solutions, but we see no need to spell out the many alternatives available nor to compel the City to rewrite the ordinance to incorporate those alternatives. The Council has the power to tailor a proper solution (Cal. Const., art. XI, §§ 5, 7; San Diego City Charter, art. I, § 2). Certainly the delays authorized under the municipal code and utilized by the Board and the Council indicate considerable effort was made to accommodate the Friends of Gill and obtain an alternative to the destruction of the House. That effort reflects recognition by the Council the City had discretion to deny the permit if a feasible alternative was ever formulated during the period of delay. All efforts having failed here, the Council rejected further delays in the issuance of the permit. We cannot say it acted without due deliberation, and we conclude the City's demolition permit issuing process does not violate the letter or spirit of the Act.

Having addressed the issues which were of public interest, we deem it unnecessary to consider any procedural deficiencies of the plaintiff's action.

Judgment affirmed.

Wiener, J., and Work, J., concurred.