[No. B022204. Second Dist., Div. Seven. Mar. 27, 1987.]

FRIENDS OF WESTWOOD, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent;
WILSHIRE-GLENDON ASSOCIATES, LTD., Real Party in Interest and
Respondent.

COUNSEL

Fisher & Moest, Barry A. Fisher, David Grosz, Evelyn Keller and Henry W. McGee, Jr., for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Susan Goodkin, Deputy Attorney General, and Stephan C. Volker as Amici Curiae on behalf of Plaintiff and Appellant.

James K. Hahn, City Attorney, Gary R. Netzer, Sr., Edward C. Dygert and Roger J. Holt, Assistant City Attorneys, Patricia V. Tubert and William F. Childs, Deputy City Attorneys, for Defendant and Respondent.

Cox, Castle & Nicholson and Kenneth B. Bley for Real Party in Interest and Respondent.

OPINION

JOHNSON, J.—This appeal arises from denial of a preliminary injunction. This injunction would have prohibited construction of a proposed office tower pending trial of the underlying lawsuit. The lawsuit, in turns, seeks a writ of mandate and injunctive relief preventing construction of the building unless and until the City of Los Angeles complies with provisions of the California Environmental Quality Act requiring environmental assessment of projects which have potential environmental consequences.

The case presents a fundamental issue under California's environmental protection legislation: Is the issuance of a building permit for a major construction project—in this instance, a 26-story, 363,000-square foot, $88 million multiple-use tower—a "ministerial project" and thus exempt from environmental assessment under the California Environmental Quality Act? We conclude there is a "reasonable probability" the plaintiffs will succeed at trial in proving the approval process for this major project qualifies as a "discretionary" rather than a "ministerial" action. Consequently, we reverse the denial of the preliminary injunction in this case.

STATEMENT OF FACTS AND PROCEEDINGS BELOW

Wilshire-Glendon Associates, Ltd. (Wilshire-Glendon), a developer, seeks to construct a 26-story office tower at the intersection of Wilshire Boulevard and Glendon Avenue in central Westwood. This proposed building would have 363,585 square feet of floor space and provide parking for 881 cars. The site to be occupied by this structure was the home of "Ship's" Coffee Shop for over a quarter century. The site comprises eight previously subdivided lots. The north half of the site is within the Westwood Village specific plan area. The south half is within the Westwood community plan area, which is part of the Los Angeles City general plan.

Planning for this project started several years before the Ship's restaurant was demolished in 1984. Wilshire-Glendon faced two formidable obstacles to construction of this twenty-six-story tower. First, the site was split by a public alley. Secondly, the Westwood Village specific plan did not allow nearly as intense development as did the Westwood community plan.

On February 26, 1982, Wilshire-Glendon sought to vacate the public alley

which bisected the property. The city's planning commission voted to oppose. However, the city engineer presented a report to the city's public works committee recommending approval with 20 conditions. The report described the plans for the site as calling for a "multi-story building with an indoor shopping center and subterranean parking." (It did not indicate the "multi-story" building would rise 26 stories, however.) The report also stated the city had the discretion to waive the requirement of a new tract map for this project. (Report of office of city engineer to public works committee from city engineer, dated Nov. 22, 1982, pp. 5-6.)[1] The public works committee held a public hearing and recommended vacation of a part of the alley with the 20 conditions. One of these conditions required Wilshire-Glendon to hold the eight previously subdivided lots on the property as one lot in consideration for the city waiving its right to require a new tract map.

On February 9, 1983, the Los Angeles City Council approved the public works' committee recommendation and also determined this alley vacation was categorically exempt from CEQA. The city drafted an ordinance implementing this decision and after all conditions were met the alley vacation went into effect on May 6, 1985. One of the last conditions to be satisfied was execution of an agreement between the city and Wilshire-Glendon that the eight lots would be held as one "in consideration of the elimination of the requirement for recordation of a new tract map." (Covenant and agreement to hold property as one parcel, Apr. 16, 1985.)

At about this time Wilshire-Glendon applied to the department of building and safety for a building permit. Because of the size of the proposed project the application was channeled into a "plan check" for "major projects," a process reserved for some 100 to 150 or so by out of over 40,000 building permit applications considered annually by the City of Los Angeles. While this plan check was underway a neighborhood association, Friends of Westwood, Inc. (FOW), began contacting various city councilmen and city administrators requesting an environmental impact report (EIR) be prepared before any building permit was issued for the Wilshire-Glendon project. The city rejected these requests and after completing its lengthy "plan check" process the city issued a building permit on December 31, 1985. During the course of approving this permit, city employees imposed a number of conditions, modifications, requirements and financial deposits on Wilshire-Glendon and relieved it of other legal requirements but allowed it to proceed with construction.

---

[1] It should be noted "tract maps" are specifically listed as among the approvals ordinarily deemed "discretionary" under CEQA. (Pub. Resources Code, § 21080, subd. (a).) Thus, had the city insisted on a tract map for this lot consolidation an EIR probably would have been required.

On January 11 and 14, 1986, FOW appealed the grant of the building permit to the chief zoning administrator. This appeal was denied on February 18, 1986. So on February 19, 1986, FOW commenced the instant suit. The trial court denied the requested temporary restraining order but set a hearing on the order to show cause for March 18, 1986. Wilshire-Glendon and the city lodged demurrers based on FOW's failure to exhaust administrative remedies since the city's board of zoning appeals had not yet acted on its appeal from the chief zoning administrator's decision. On April 29, 1986, the board of zoning appeals affirmed FOW's request for a preliminary injunction based on its amended complaint. After a hearing, the trial court denied the preliminary injunction and also denied a request for stay pending appeal.

On August 4, 1986, FOW served its notice of appeal on this court. It also requested a temporary stay and a writ of supersedeas. On August 15, 1986, this court denied FOW's petition for writ of supersedas, set an expedited briefing schedule, and warned Wilshire-Glendon it would proceed with construction at its own risk. Briefing was completed on October 27, 1986, and oral argument held on December 4, 1986. The parties completed supplemental briefing on January 9, 1987.

DISCUSSION

The parties do not quarrel over the proper standard of review of orders denying preliminary injunctions.     ■     A trial court should grant a preliminary injunction if it finds the plaintiff has a "reasonable probability" of prevailing at trial and will suffer more harm from denial of the preliminary injunction than defendant would suffer from its grant. (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 205-06 [211 Cal.Rptr. 398, 695 P.2d 695], *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121].) Both parties would suffer harm if the building were constructed and then had to be torn down. Hence the instant appeal hinges on whether the trial court abused its discretion in ruling it is not "reasonably probable" the plaintiff will prevail on the merits at trial. Since the facts are not in serious dispute the primary issue is whether the trial court's interpretations of the applicable laws are correct. Accordingly, we now turn to a consideration of the central legal issues in this case.

I. LEGAL CRITERIA FOR DETERMINING WHETHER A PROJECT IS "DISCRETIONARY" OR "MINISTERIAL"

We first point out what this case is not about. It does not involve whether Wilshire-Glendon can build its proposed multiple-use tower in Westwood. The only issue here is whether an environmental impact report or at least a negative declaration will have to be prepared before the city decides

whether and what kind of building can be constructed on this site. It may well be that an EIR (or negative declaration) would show Wilshire-Glendon should be allowed to proceed with existing plans or it might require further modifications in the plans. Another thing in no way involved in this case is whether EIR's (or negative declarations) will be required in the future for all building permits in the City of Los Angeles. In this case we are talking only about the approval process for a project unusual in size, dimension and location. Finally, properly conceived, this case is not about whether the city *abused its discretion* in granting this building permit but whether it *exercised* its discretion in that process and therefore should have conducted an environmental assessment as part of the process of considering the permit.

The California Environmental Quality Act, California Public Resources Code sections 21000-21177 (seq.) was enacted in 1970 to "[e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the *guiding criterion* in public decisions." (Pub. Resources Code, § 21001, subd. (d), italics added.) In land use decisions, this purpose is implemented by requiring municipalities to prepare an environmental impact report as to "*any project* [it] intend[s] to carry out or approve which may have a significant effect on the environment" (Pub. Resources Code, § 21151, italics added.) Before ordering an EIR a municipality conducts an initial study. (Pub. Resources Code, § 21080, subd. (c)(2).) If this initial study reveals "[t]here is no substantial evidence . . . that the project may have a significant effect on the environment" (Pub. Resources Code, § 21080, subd. (c)(1)) it can file "a negative declaration." (Pub. Resources Code, § 21080, subd. (c).) Otherwise it must conduct an actual environmental impact report which details the potential consequences for the environment and specifies measures which would mitigate those consequences.

In the early years of CEQA it was not altogether clear it applied to private as opposed to public projects. However, this question was answered in the affirmative by the California Supreme Court in the landmark case of *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049]. At the time this decision was filed, the Legislature already was considering bills designed to strengthen and refine CEQA. This legislation was amended to address some of the ramifications of *Friends of Mammoth*. The final bill included a new section of special significance in the instant case. "[CEQA] shall not apply to . . . *ministerial projects* proposed to be . . . approved by public agencies . . . ." (Pub. Resources Code, § 21080, subd. (b)(1).) "Except as otherwise provided . . . [CEQA] *shall apply* to *discretionary* projects proposed to be . . . approved by public agencies . . . ." (Pub. Resources Code, § 21080, subd. (a), italics added.)

Wilshire-Glendon and the city contend that the building permit approval process in this case was "ministerial" within the meaning of the CEQA defi-

nition and thus exempt from CEQA. FOW responds it was a "discretionary" decision and thus CEQA applies.

The language of CEQA itself does not resolve this issue. The original bill amending CEQA to exempt "ministerial" decisions, Assemby Bill No. 889, expressly listed the issuance of building permits as "ministerial projects" at the time the bill was reported out by the Senate Committee. However, building permits were deleted from the list during the legislative process and the amendment as enacted by the California Legislature contained no such reference. (Seneker, *The Legislative Response to Friends of Mammoth: Developers Chase the Will-o'-The Wisp,* (1973) 48 State Bar J. 126, 165, fn. 114.)

Respondents argue the term "ministerial" should be defined by a line of judicial decisions which categorizes those acts for which government employees will be immune from liability in tort. (See, e.g., *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], *Wheeler* v. *County of San Bernardino* (1978) 76 Cal.App.3d 841 [143 Cal.Rptr. 295].) "According to *Johnson,* immunity attaches only to *basic policy decisions,* involving conscious balancing of risks and advantages, activity which may be characterized as the *planning rather than* the *operational level* of decision making. (Citations omitted.)" (*Wheeler* v. *County of San Bernardino, supra,* 76 Cal.App.3d at p. 848, italics added.)

In essence, these cases elevate "discretionary acts" to the high plane of general policy decisions and limit immunity to those decisions. Anything governmental employees do in *implementing* that general policy is deemed ministerial and thus *not* immune from tort liability. Wilshire-Glendon and the city argue the city council made the only discretionary decisions when it enacted the ordinances governing issuance of building permits. What the various city departments do is merely *implement* those general policies and hence are engaged only in "ministerial" actions.

We see no reason to undertake an analysis of whether and when city employees are immune from suit for decisions made during consideration of a building permit. In this case, we are not concerned with governmental tort liability. The purpose and legislative history of section 21080 both draw a different boundary line between "discretionary" and "ministerial" approvals. So do the CEQA guidelines and judicial decisions interpreting this statutory section.

█ *Purpose of CEQA.* As applied to private projects, the purpose of CEQA is to minimize the adverse effects of new construction on the environment. To serve this goal the act requires assessment of environmental conse-

quences where government has the power through its regulatory powers to eliminate or mitigate one or more adverse environmental consequences a study could reveal. ■ Thus the touchstone is whether the approval process involved allows the government to shape the project in any way which could respond to any of the concerns which might be identified in an environmental impact report. And when is government foreclosed from influencing the shape of the project? Only when a private party can *legally compel* approval without any changes in the design of its project which might alleviate adverse environmental consequences.

*Legislative intent behind section 21080.* The legislative history of Public Resources Code section 21080 is consistent with this interpretation of "ministerial." In an opinion rendered during the Legislature's deliberations over Assembly Bill No. 889, the bill which created Public Resources Code section 21080, the Office of the Legislative Counsel defined what was meant by the clause exempting ministerial projects from CEQA. "A ministerial act is an act with respect to the performance of which a public officer can exercise *no* discretion, such an act of [*sic*] duty as may be *prescribed* by some existing law which it is *incumbent* upon it to perform *precisely* as laid down by the law. (*Chase* v. *Kalber* (1951) 28 Cal.App. 561.)" (Italics added.) (Opinion letter from John Corzine, Deputy Legislative Counsel, to Assemblyman William T. Bagley, dated Dec. 1, 1982, p. 2, italics added.) Thus, the legislators were being informed the "ministerial" projects they were exempting from CEQA were only those where public employees had *no* discretion whatsoever and instead had a legal *duty* to do something and to do it only one way.

The history surrounding the inclusion and then deletion of "building permits" from the list of "ministerial" projects is even more revealing. As originally drafted, the bill creating Public Resources Code section 21080—Assembly Bill No. 889—listed certain "projects" deemed to be ministerial.[2] This list included not only the issuance of building permits but the issuance of grading permits as well.[3] However, on November 27, 1972, the Senate

---

[2]Section 21080 of Assembly Bill No. 889 was added by amendment in the Senate on November 13, 1972. This section read in this initial version as follows:

"This division shall apply to all discretionary projects proposed to be carried out by public agencies, including, but not limited to, the enactment and amendment of the zoning ordinances, the issuance of the zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps. (Except where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166.)

"This division shall *not* apply to nondiscretionary, ministerial projects proposed to be carried out by public agencies, including but not limited to, the issuance of *building permits,* the issuance of *grading permits,* approval or waiver of parcel maps and the approval of final subdivision maps." (Cal. Legislature-1972 Reg. Sess., Assem. Bill No. 889, as amended in Senate Nov. 13, 1972, italics added.)

[3]The presence of grading permits on this initial list is especially significant because their issuance already has been held to be "discretionary" rather than "ministerial" at least where they involve "major" grading projects. (*Day* v. *City of Glendale* (1975) 51 Cal.App.3d 817 [124 Cal.Rptr. 569] discussed *infra* at pp. 269, 270, 279.)

amended Assembly Bill No. 889 and deleted grading permits from the list of "ministerial" projects. (Cal. Legislature-1972 Reg. Sess., Assembly Bill No. 889, as amended in Senate Nov. 27, 1972.) Two days later it amended the bill again this time deleting building permits as well. (Cal. Legislature-1972 Reg. Sess., Assembly Bill No. 889, as amended in Senate Nov. 29, 1972.)

The reason for removing building and grading permits from the subsection exempting ministerial projects from environmental review is explained in a December 14, 1972, memorandum from the committee consultant to a legislator who had received letters from environmental organizations objecting to several features of Assembly Bill No. 889. This memorandum reads in pertinent part: "Assemblyman Knox (the author of AB 889) gave me the following answers to the specific points raised in your letter ... 2. There was never any attempt to exempt *all* building and grading permits from the act—only those which could be classified as *purely* 'ministerial acts.' Preparation of an impact report would serve *no practical purpose* in connection with such actions. Once again, this issue was resolved to the satisfaction of environmental lawyers by adopting drafting changes which simply excluded all *purely* ministerial acts from the application of the Environmental Quality Act."

Assemblyman Knox further explained the reason the Legislature deleted specific mention of building and grading permits as "ministerial" projects in a letter he sent to a constituent after passage of Assembly Bill No. 889. The constituent inquired, "We would like to know the effect, if any, of the change in wording from the November 16 version of Section 21080 to the November 30 version. Specifically, we would like to know whether it was the intention to include within the CEQA those types of permits specifically enumerated in the November 16 version of the Bill and deleted from the November 30 version or whether it is still the intention of Section 21080 to make the CEQA not applicable to those permits and approval." (Undated letter of Jack C. Crose to Honorable John T. Knox.)

Assemblyman Knox replied in pertinent part: "The purpose of Section 21080 was to clarify the applicability of the Environmental Quality Act to ministerial activities. California courts have long held that 'ministerial' actions are those which *legally require* the issuance of a permit, ... if the applicant therefor satisfies certain *specific* requirements.... The essential element of a ministerial act is that the approving agency does not have the legal authority to refuse a qualified applicant *or to insist upon modifications or changes* in his project. ...

"The earlier versions of Section 21080 tried to convey this intent by listing specific examples of activities usually considered to be ministerial—viz.— the issuance of building permits, the issuance of grading permits, etc.

"It was subsequently pointed out, however, that such actions are not always ministerial. Some local building ordinances, for example, grant local officials the *authority to require substantial changes in building design* or even to refuse a building permit altogether. Such situations are *not ministerial* and should fall within the scope of the Environmental Quality Act." (Letter from Honorable John T. Knox to Mr. Jack C. Crose dated Feb. 6, 1973, italics added.)[4]

This legislative history makes it abundantly clear the term "ministerial" is limited to those approvals which can be legally compelled without substantial modification or change. Thus, the fact a city lacks the discretion to deny a building permit outright in the event environmental problems are identified does not make issuance of the permit "ministerial." It is enough the city retains discretion to require substantial changes in building design.

*Administrative guidelines.* CEQA authorizes the office of planning and research (OPR) to issue guidelines implementing the act. As a whole, these guidelines appear consistent with the interpretation of "ministerial" which flows from the purpose and legislative history of Public Resources Code section 21080.

CEQA [tit. 14, Cal. Admin. Code] section 15268, subdivision (b) provides: "In the absence of *any* discretionary provision contained in the local ordinance or other law establishing the requirements for the permit, license, or other entitlement for use, the following actions shall be *presumed* to be ministerial:

"(1) Issuance of *building permits* . . . ." (Italics added.)

A cursory reading of this guideline could lead one to conclude the Office of Planning and Research considers building permits to be "*presumptively* ministerial." However, on more careful reading it is apparent the presumption arises *only* where a precondition exists—the public entity must retain *no* discretion in connection with issuance of the building permit. But if the ordinances governing building permits contain "*any* discretionary

---

[4]We include this letter from Assemblyman Knox not because it shows what he personally intended these words to mean when he voted for Assembly Bill No. 889. Rather it is evidence of the history of the deletion of grading permits and building permits from the "ministerial" section of the bill. That is, it describes what happened and why it happened. As author of the legislation and Chairman of the Assembly Committee on Local Government Assemblyman Knox was ideally situated to be familiar with this history. (*County of San Diego* v. *Superior Court* (1986) 176 Cal.App.3d 1009, 1021 [222 Cal.Rptr. 484].)

provision" the presumption is not just dissolved; it simply fails to come into existence.[5]

What is meant by "any discretionary provision" is suggested by other CEQA guidelines in California Administrative Code, title 14 (hereinafter cited as [Cal. Admin. Code]). Section 15369 reads in pertinent part: "A building permit is ministerial if the ordinance requiring the permit *limits* the public official to determining whether the *zoning allows* the structure to be built in the requested location, the structure would meet the *strength requirements* in the Uniform Building Code, and the applicant has *paid his fee*." (Italics added.)

Another CEQA guideline [Cal. Admin. Code] in turn defines a discretionary project as one which "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." ([Cal. Admin. Code] § 15357.)

A "ministerial" act meanwhile is further defined in the guidelines as "a governmental decision involving little or no personal judgment by the public official as to the wisdom *or manner of carrying out* the project. . . . A ministerial decision involves only the use of *fixed standards* or *objective measurements,* and the public official cannot use personal, subjective judgment in deciding whether *or how* the project should be carried out." ([Cal. Admin. Code] § 15369, italics added.)

CEQA [Cal. Admin. Code] section 15268, subdivision (c) requires each local agency to identify actions which it deems "ministerial under the applicable laws and ordinances." The City of Los Angeles has listed the issuance of building permits as a ministerial act. (City of Los Angeles Guidelines for the Implementation of the California Environmental Quality Act of 1970 (rev. ed. 1978) § III.2.B (1).) ■ However, a municipality's classification of a certain approval process as ministerial is *not* conclusive. "The applicability of CEQA cannot be made to depend upon the unfettered discretion of local agencies, for local agencies must act in accordance with state guidelines *and the objectives of CEQA*." (*Day* v. *City of Glendale, supra,* 51 Cal.App.3d at p. 822.)

Significantly the state guidelines also provide "where a project involves

---

[5]This does not foreclose the possibility issuance of a building permit can be considered ministerial even though *some* discretion is involved. But it does mean where discretion is present the building permit must be found ministerial without the aid of any administrative presumption.

an approval that contains elements of *both a ministerial action and a discretionary action,* the project *will be deemed to be discretionary* and will be subject to the requirements of CEQA." (CEQA [Cal. Admin. Code] § 15268, subd. (d), italics added.)

■ Putting all these guidelines together, it can be seen OPR considers issuance of a building permit "presumptively ministerial" only where the agency has *no* power to exercise its personal judgment as to the manner *any* phase of a project is carried out but instead *only* has the power to determine whether zoning allows the structure to be built and whether it satisfies strength requirements, and nothing more, and then only when those decisions involve application of *fixed* standards and *objective* measurements.

*Judicial interpretations.* Prior judicial decisions likewise have adopted a restrictive definition of "ministerial projects" considered exempt from environmental review. ■ The California Supreme Court has held CEQA must "be interpreted in such manner as to afford the *fullest possible protection* to the environment within the *reasonable* scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259, italics added.) Following this mandate, other courts have established the principle that CEQA applies even where the process is largely ministerial. As one court held: "Statutory *policy,* not semantics, *forms the standard for segregating discretionary from ministerial functions* . . . . CEQA is to be interpreted to ' "afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citation omitted.] . . .So construed, section 21080 extends CEQA's scope to hybrid projects of a mixed ministerial-discretionary character; doubt *whether a project is ministerial or discretionary should be resolved in favor of the latter characterization.*" (*People* v. *Department of Housing & Community Dev. (Ramey)* (1975) 45 Cal.App.3d 185, 194 [119 Cal.Rptr. 266], italics added.)

The *Ramey* court held issuance of a mobile park construction permit— an approval closely analogous to a building permit for a substantial building —was a discretionary act and therefore subject to CEQA. The court conceded the approval process for mobilehome parks involved a large number of "ministerial" decisions applying "*fixed* design and construction specifications covering such matters as space occupancy, road access, toilets, showers and laundry facilities." However, it noted there were other approval decisions where the standards were "relatively general. The applicant for a mobilehome construction permit must submit a 'description of the water supply, ground drainage and method of sewage disposal.' . . . . There must be a 'sufficient' supply of artificial lighting . . . . The water supply must be 'adequate' and 'potable.' . . . . The site must be 'well-drained and graded.' " These latter decisions made the entire mobilehome construction permit process discretionary within the meaning of CEQA because they involved

"relatively personal decisions addressed to the sound judgment and enlightened choice of the administrator. These decisions may have great environmental significance relative to one physical site, negligible significance in another. Inevitably they evoke a strong admixture of discretion." (*People* v. *Department of Housing & Community Dev. (Ramey, supra,* 45 Cal.App.3d at p. 193.)

Similarly, in *Day* v. *City of Glendale, supra,* 51 Cal.App.3d 817, Division Two of this court held issuance of a *grading* permit for a highway construction project involved enough discretionary elements to invoke the EIR provisions of CEQA. And it did so even though grading permits, like building permits, had been listed in the original version of Assemby Bill No. 889 as "ministerial projects" and even though the Glendale City Council had classified grading permits as "ministerial" projects categorically exempt from CEQA.

In *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959 [131 Cal.Rptr. 172], another court held approval of "timber harvesting plans" was subject to CEQA because the state forester was authorized to use his "personal judgment" in evaluating whether a proposed timber operation complied with the Forests Practice Act and conferred "authority upon the state forester to 'state reasonable conditions' which in his 'professional judgment' are necessary to bring a nonconforming plan into compliance with the Rules." (*Id.,* at p. 971.)

*The functional distinction between "ministerial" and "discretionary" projects under CEQA.* We extract certain principles from this survey of legislative purpose, legislative history, administrative guidelines, and prior judicial interpretations. To properly draw the line between "discretionary" and "ministerial" decisions in this context, we must ask why it makes sense to exempt the ministerial ones from the EIR requirement. The answer is that for truly ministerial permits an EIR is irrelevant. No matter what the EIR might reveal about the terrible environmental consequences of going ahead with a given project the government agency would lack the power (that is, the discretion) to stop or modify it in any relevant way. The agency could not lawfully deny the permit nor condition it in any way which would mitigate the environmental damage in any significant way. The applicant would be able to legally compel issuance of the permit without change. Thus, to require the preparation of an EIR would constitute a useless—and indeed wasteful—gesture.

Conversely, where the agency possesses enough authority (that is, discretion) to deny *or modify* the proposed project on the basis of environment consequences the EIR might conceivably uncover, the permit process is "discretionary" within the meaning of CEQA. Indeed one court held it

sufficient when the only "discretion" an agency possessed was to *delay* a project even though it could not reject or modify the project. (*San Diego Trust & Savings Bank* v. *Friends of Gill* (1981) 121 Cal.App.3d 203 [174 Cal.Rptr. 784] [city's power to temporarily stay demolition of an allegedly historic building although "arguably ... ministerial" was deemed "discretionary in nature"].)

Accordingly, the question here is whether the city had the power to deny *or condition* this building permit or otherwise modify this project in ways which would have mitigated environmental problems an EIR might conceivably have identified. If not, the building permit process indeed is "ministerial" within the meaning of CEQA. If it could, the process is "discretionary." It is also discretionary if the city possessed the power to require another form of approval—in addition to the building permit—which could have been denied or conditioned on the basis of the EIR, but chose not to. None of this means the ordinances governing building permit approvals must expressly mention EIRs or authorize denial or modification of permits based specifically on the results of environmental assessments. It is enough the city possesses discretion to require changes which would mitigate in whole or in part one or more of the environmental consequences an EIR might conceivably uncover.

## II. THE APPROVAL PROCESS FOR THE BUILDING PERMIT FOR THE PROPOSED WILSHIRE-GLENDON TOWER WAS A "DISCRETIONARY PROJECT" WITHIN THE MEANING OF CEQA

It is well to remember we are not in this case asked to judge whether the city *abused* its discretion in issuing this building permit. The question is whether it *exercised* any substantial degree of discretion and whether it conceivably could have been guided in the exercise of this discretion by an environmental assessment. If it exercised such discretion—or even if it had the power to exercise discretion but failed to do so—this is a "discretionary project" within the meaning of CEQA.

### A. *City Employees Exercised Substantial Discretion in Establishing Standards the Building Was Required to Meet and in Waiving Compliance With Standards the City Council Itself Had Established Through Ordinance*

The approval process for a "major project" such as the instant 26-story office tower is far different than the process used in approving building permits for single-family residences, small apartment buildings and even medium-sized structures. Out of over 40,000 building permits the city issues every year, only 100-150 are subjected to the rigors of the so-called "plan check" regime for "major projects." Some of the complexity of this "plan

check" process is captured in the flow chart which is included as appendix A to this opinion. However, it is not the number of decision points on this flow chart which alone makes the "plan check" a discretionary approval process. Rather it is the amount of discretion public employees exercise at many of these decision points.

In the instant case, city employees set—or had the opportunity to set— standards and conditions as to many aspects of the proposed building. For example, the city engineer was empowered to determine what dedications and modifications would be sufficent to provide "adequate" ingress from and egress to the public streets (L.A. Mun. Code, § 12.37(A) (1983).) The building and safety department was authorized to require modifications in access driveways it deemed necessary in its judgment to minimize interference with the flow of traffic. (L.A. Mun. Code, § 12.21(A)(5)(e) (1983).) The department of transportation may even set standards for internal parking circulation if necessary to ensure what happens *within* the building is not "detrimental to the flow of traffic" *outside* the building. (L.A. Mun. Code, § 12.21(A)(5)(j) (1985).)

Not only are there many ordinances which expressly confer discretionary power on city employees to set their own standards and conditions and require their own modifications, but the code also gives the department of building and safety discretion to modify precise, often quantified, requirements the city council itself has established. (L.A. Mun. Code, § 98.00403(1)(b) (1983).) The department has the power to grant "*slight* modifications" where "a special, individual reason makes the strict letter of the ordinance impractical and . . . the modification is in conformity with the *spirit and purpose* of the ordinance involved." (L.A. Mun. Code, § 98.0403(1)(b), italics added.) There is no definition of "slight" and that determination as well as what conforms to the "spirit and purpose" of the ordinance is left to the untrammeled discretion of city employees. The head of the "plan check" unit concedes that most of these modifications of fixed standards are "at the discretion of the (departmental employee) who is considering it" and there are about "80 different individual checkers . . . ."

In the instant case, the building and safety department allowed several departures from the standards the city council had enacted. These included allowing an opening between the basement level and upper levels of the building which is specifically prohibited by the code. The department also eliminated the requirement for separate elevator vestibules for the shuttle elevator, even though this is also specifically required by the code to protect against smoke migration from one floor to another.

Significantly, the city also had discretion to grant relief from city council established standards at many other junctures of the approval process. The

fact it may have exercised its discretion to refuse modifications does not make the decision any less discretionary.

The city also exercised its discretion to exempt this project from the requirement it be found consistent with the city's general plan. Municipal Code section 159,748, paragraph 4(D) requires this consistency finding unless a project is found to be situated "within the area governed by a . . . specific plan." Although only half of the Wilshire-Glendon project fell within Westwood's specific plan area the city exercised its discretion to exempt the entire project from the consistency finding. Had it required consistency with that plan it might have acquired the discretion to modify the building further to take account of still more environmental concerns which might be identified through an environmental assessment.

The city further exercised discretion as to an important issue not commonly raised by most "major" buildings. It decided to allow this tower to intrude into the low density Westwood specific plan area. In this case we are not deciding the city *abused* its discretion in allowing this intrusion. Rather we are deciding that it is a decision involving discretion and not something predetermined by "fixed standards" established by ordinance or other laws.

As proposed, the project straddled the two planning areas—the Westwood specific plan area which only allowed a three-to-one ratio of building bulk to the size of lot and the Westwood community plan area which allowed a ten-to-one ratio. The city had the discretion to require Wilshire-Glendon to apply for an exception to the specific plan or for a plan-area boundary change before allowing this intrusion into the low density specific plan area. Instead it chose to exercise its discretion to draw an imaginary line through the proposed tower and treat that portion of the building which fell on the specific plan side as if it were a separate building within that area and likewise treat the portion of the tower which fell on the community plan side of the imaginary line as if it were a separate building within that area. The city had the discretion to do so because of Los Angeles Municipal Code section 12.21.1(A)(6) which provides: "Whenever any unusual situation or design of building exists so that it is difficult to determine the precise application of these [building bulk] provisions, the Department of Building and Safety shall make such determination in a manner to carry out the indicated *purpose and intent* hereof." (Italics added.) It is difficult to describe this ordinance as establishing a "fixed standard" or to characterize what department officials did in implementing this ordinance as anything other than exercising discretion.

If the city had elected to require an amendment to the specific plan or an adjustment in the plan boundary it would have invoked the EIR provisions

of CEQA. By exercising its discretion instead to draw an imaginary line the city stayed within the building permit approval process which, as we have seen, the city characterizes as "ministerial." Thus the city used its discretion to avoid approval processes which would have required compliance with CEQA.

It may well be the city employees did *not* abuse their discretion in choosing to draw the imaginary line through the 26-story portion of this building and thereby allow it to intrude into the Westwood Village specific plan area. But it clearly also would not have been an *abuse* of the city's discretion to have refused to do so. That is, Wilshire-Glendon would not have been able to *legally compel* the city to draw the imaginary line and allow this intrusion into the Westwood specific plan area. The city employees could have readily concluded it would have been inconsistent with the Westwood specific plan to have allowed *any* 26-story segment of a building to intrude into that plan's area. It would have been especially easy to reach this conclusion when one considers the ordinance creating the specific plan severely limits the transfer of building rights *within* the specific plan area to essentially foreclose the possibility of constructing such a massive structure.[6]

To justify its argument the building permit process in this case was a "ministerial" approval despite the discretionary elements mentioned above, Wilshire-Glendon cites and relies heavily upon a number of cases in which the issuance of building permits indeed were held to be "ministerial" actions. (*Elysian Heights Residents Assn., Inc.* v. *City of Los Angeles* (1986) 182 Cal.App.3d 21, 31 [227 Cal.Rptr. 226]; *Court House Plaza Co.* v. *City of Palo Alto* (1981) 117 Cal.App.3d 871, 883 [173 Cal.Rptr. 161]; *People* v. *Department of Housing & Community Dev., supra,* 45 Cal.App.3d 185, 189-190; *Ellis* v. *City Council* (1963) 222 Cal.App.2d 490, 497 [35 Cal.Rptr. 317]; *Munns* v. *Stenman* (1957) 152 Cal.App.2d 543, 557 [314 P.2d 67]; and *Palmer* v. *Fox* (1953) 118 Cal.App.2d 453, 458 [258 P.2d 30].)

None of these cases is inconsistent with our ultimate holding here. None of them held issuance of a building permit could *never* constitute a discretionary decision within the meaning of CEQA. Nor could they have given what we have learned about the purpose and legislative history of Public Resources Code section 21808. To the extent these decisions establish a general proposition it is one consistent with the principles mentioned earlier

---

[6]Ordinance No. 145,043, as amended, section 3 (b) reads in pertinent part: "The authority to construct the floor area on any parcel in the Specific Plan area may be transferred . . . to another parcel in the Specific Plan area so long as the floor area ratio . . . accumulated on any parcel does not exceed six times the buildable area of the parcel. . . . Whenever any unusual situation, use or design of a building exists so that it is difficult to determine the precise application of these provisions, the Director of Planning of the City of Los Angeles shall make such determinations in a manner to carry out the intent of the Specific Plan. . . ."

in this opinion. Run-of-the-mill building permits *are* "ministerial" actions not requiring compliance with CEQA. But none of the cases cited by Wilshire-Glendon suggest the "plan check" process for considering a building permit for a 26-story, 360,000-square foot multiple use tower straddling two plan areas and involving the consolidation of eight separate lots into one was necessarily and inevitably a "ministerial" process.

Superimpose the definition of a "ministerial" building permit approval process found in the CEQA [Cal. Admin. Code] over the "plan check approval" process required for this 26-story office building and the misfit becomes dramatically obvious. That definition, as will be recalled, reads in pertinent part: "A ministerial decision involves only the use of *fixed standards* or *objective measurements,* and the public official cannot use personal, subjective judgment in deciding whether *or how* the project should be carried out. . . . A building permit is ministerial if the ordinance requiring the permit *limits* the public official *to determining* whether the *zoning allows* the structure to be built in the requested location, the structure would meet the *strength requirements* in the Uniform Building Code, and the applicant has *paid his fee.* ([Cal. Admin. Code] § 15369, italics added.)

The [Cal. Admin. Code, tit. 14] definition is easily satisfied where the city council by ordinance has established a comprehensive set of precise, quantified criteria—i.e., setbacks must be at least 15 feet, buildings may be no more than 3 stories and no higher than 50 feet, etc. In that event, the only decisions the administrative employees must make are whether the plans the developer submits indeed call for setbacks of 15 feet, a height of 50 feet or less and 3 stories or less, etc. If there is compliance with all the precise, quantified standards set by the city council the relevant agency employees must issue the building permit. That is the sort of *purely* ministerial decision both the Legislature and the CEQA [Cal. Admin. Code] drafters intended to exempt from the environmental assessment provisions of the act. The city's administrative employees would lack the power to increase the setback requirements or reduce the maximum building height or the number of stories of the structure no matter what an EIR might reveal about the environmental consequences of a structure which went all the way to the height limit or was only set back 15 feet from the lot line.

But here, as is abundantly clear from our brief sampling of the "plan check" process, city employees are by no means limited to determining whether the proposed highrise is allowed within the zone and and complies with strength requirements. It is readily apparent Wilshire-Glendon was in no position to *legally compel* issuance of this building permit for the exact plan it submitted to the city. It was not a matter of designing a project to conform with fixed, preexisting standards set forth in city ordinances. Instead this was a situation where city employees retained the power, that

is, the discretion to set standards for many important phases of the building project and to insist on modifications in the building plans to conform with those standards it created. And indeed in approving the Wilshire-Glendon project the city established a number of standards, some of which the original plans met and some of which required modifications in those plans. In other instances, the city accepted features it could, as a legal matter, have rejected. But Wilshire-Glendon was not entitled to go to court and legally compel the city to accept those features. Nor was Wilshire-Glendon in a position to legally compel the city to set the exact standards and to require only the exact modifications it did. Conceivably Wilshire-Glendon was entitled to compel the city to exercise its discretion and set some sort of standards and announce what modifications it was demanding, that is, to compel the city to process its application in some way. However Wilshire-Glendon was not entitled to require this discretion to be exercised in only one way. The city employees instead are empowered by ordinance to use largely subjective criteria to create individualized standards as to a vast array of important issues.

■ The city also argues the discretion of its officials and departments has been eliminated or sharply circumscribed by the development of formal or informal administrative policies, guidelines and practices. Hence these policies, guidelines, and practices amount to "fixed" standards agency personnel merely apply in a ministerial fashion. Department officials testified about having frequent training meetings with subordinate employees in which they conveyed uniform criteria and practices which the department had developed which they expected the men and women in the field to apply. (They also testified many decisions of necessity were made without much guidance or supervision.) But in any event these formal and informal administrative policies do not convert discretionary decisions into ministerial ones at least within the meaning of CEQA. To be ministerial, a decision must be one the administrative agency itself is forced to follow. It must be a standard fixed by statute or ordinance or the enactment of some other legislative body. It cannot be a standard the administrative agency itself exercised its own discretion to create and therefore which it possesses the discretion to modify or ignore should an environmental assessment reveal the standard would cause adverse environmental consequences if the agency continued to apply it.

B. *Many of These Discretionary Decisions Involved Matters Which Conceivably Could Have Mitigated the Environmental Effects of the Project and Thus Could Have Profited From an Environmental Assessment Pursuant to CEQA*

■ Much of the discretion the city employees exercised during this building permit approval process related directly to problems an environmental assessment would be calculated to uncover if they exist.

For instance, FOW suggests extreme traffic congestion is one of the environmental concerns most likely to surface through any such study. As will be recalled, the city employees had the power to exercise and did exercise substantial discretion in establishing the standards for ingress and egress of vehicles, internal parking circulation, and even modifications and improvements in streets and traffic control fixtures external to the building. This is not to say the standards which were fixed and the modifications and dedications which the city required were so minimal or erroneous they constitute an *abuse of discretion*. Rather it is to underscore these were discretionary decisions which could have been guided by a thorough environmental assessment. It is entirely possible such a study would have led the city to establish exactly the same standards and impose exactly the same modifications and dedications as it did. On the other hand, it also is entirely possible a study would have disclosed patterns, trends, and problems which would have led the city to impose different or more rigid standards and modifications and to exact different or larger dedications and require greater contributions to the improvement of streets and traffic facilities external to the building.

Similarly, an environmental assessment may have identified dire consequences for Westwood Village from the intrusion of this 26-story structure into the specific plan area or merely from the added size of the total structure made possible by this intrusion. Thus the city in exercising its discretion might have decided against drawing an imaginary line through the building and allowing this intrusion into the Westwood specific plan area.

Since an environmental impact report has not yet been undertaken with respect to the Wilshire-Glendon project we do not yet know what other types of environmental impacts it might uncover. There has not even been a preliminary environmental assessment to identify what potential impacts should be studied. So it is difficult to say with any certainty the city employees will be able to mitigate these other yet unknown adverse environmental consequences through modifications, conditions, and dedications they are entitled to impose through the building permit approval process. However, given the many areas in which these employees exercise discretion in the "plan check" process for major projects it seems "reasonably probable" the city indeed would be able to address some, if not all, of these other consequences which a thorough environmental assessment might reveal.

C. *The Building Permit Approval Process for This Major Building Involves So Much Discretion as to Matters Which Have Potential Implications for the Environment It Surpasses the Threshold Level of Discretion Required to Qualify as a "Discretionary Project" Even Though Most Building Permits Remain "Ministerial Projects"*

Respondent predicts all manner of dire consequences should we hold issuance of the building permit in this case constitutes a "discretionary project"

within the meaning of Public Resources Code section 21080. They warn that if this one requires environmental review so would all the other 40,000 building permits issued each year in the City of Los Angeles. The entire building permit approval process would be thrown into chaos and new construction of all kinds would lurch to a halt.

We have some doubts the building permit approval process would be tied in knots even were we to hold all building permits were discretionary. Both sides, for their own reasons, pointed out San Francisco has designated all building permits to be discretionary and thus subject to the environmental provisions of CEQA. No evidence was submitted suggesting this has led to a regulatory quagmire in that city. Nonetheless, we emphasize we are *not* holding in this opinion that all or most building permit approvals in Los Angeles represent "discretionary projects" within the meaning of section 21080. Quite the contrary, the vast majority of building permits issued in this city probably do not cross the threshold level of discretion required to qualify as "discretionary projects."

The fact public employees exercise their discretion to modify a single city council established standard or to impose a single condition or modification does not automatically mean the approval process is a "discretionary project" within the meaning of Public Resources Code section 21080. Yet when that discretion is exercised as to several items and in the context of approval of a major project with substantial potential effects on the environment the process moves from a ministerial to a discretionary decision. It is the difference between swinging a toothpick "slightly"—say 10 or 20 degrees —once or twice as opposed to swinging a baseball bat time and again through a similar arc. The baseball bat will have a lot more "impact." In the instant case it is the sheer quantity and consquences of discretionary decisions— some of them minor, some more significant—that turn this building permit approval process into a "discretionary" project. As conceded by the head of the "Plan Check" unit, "You just don't build without some type of slight modification. But any major building has many modifications."

We also emphasize this is not a situation where an environmental impact report had already been prepared during an earlier stage of discretionary review of this project. In many instances, a major project is thoroughly scrutinized during approval of a tract map or a conditional use permit. If so, an environmental impact report (or at least a negative declaration) will almost always have been prepared as to the project in connection with this earlier stage of review. Where this has been done it will seldom be necessary to require an additional environmental assessment when considering issuance of the building permit. For one thing, most of the discretionary decisions—the modifications, conditions, and the like—will have been worked out during the tract map or conditional use permit phase of project

approval. For another, the environmental impact report itself will already exist. It can be used to guide whatever discretion remains to be exercised during the building permit approval process.

We bear in mind Justice Fleming's perceptive admonition in his landmark opinion in *Day* v. *City of Glendale*. He counseled that the legislative purpose behind CEQA should not be defeated by allowing the "ministerial" exception to insulate major projects with substantial environmental consequences from the requirements of the act. "[T]he discretionary-ministerial designation of a project is not necessarily determinative of its environmental impact. We do not believe the Legislature intended to exclude from the ambit of CEQA *any project* involving, as here, cut, movement and fill of massive sections of earth. . . . The issuance of the grading permit is the *only point* at which the environmental impact of the project may be publicly considered before mountains are moved and seventy acres of canyon are filled." (*Day* v. *City of Glendale, supra,* 51 Cal.App.3d 817, 824, italics added.) Similarly, in the instant case, the issuance of the building permit is the only point at which the environmental impact of this project may be publicly considered before a concrete and glass "mountain" is *erected* and Westwood's streets are filled with hundreds of additional vehicles.

## CONCLUSION

We hold on the basis of the evidence before the trial court at the hearing on the preliminary injunction it is "reasonably probable" FOW will be able to prove the building permit approval process for the Wilshire-Glendon office tower constitutes a "discretionary project" within the meaning of CEQA.[7] If it is a "discretionary project," the EIR provisions of CEQA would apply. In ruling the other way on this legal issue, the trial court erroneously concluded it was not "reasonably probable" FOW could prevail on the merits at trial. Applying the proper legal interpretations to the facts the trial court

---

[7]We hold FOW established a reasonable probability it will demonstrate enough relevant discretionary action in the phases of the building permit approval process discussed earlier in this opinion (see p. 265, *ante*) to qualify issuance of this building permit as a "discretionary project." Accordingly, we need not consider whether FOW has a reasonable probability of prevailing in the main action with respect to other potential areas of discretion in this permit process. These include: (1) whether the building permit could be denied, conditioned, or modified to respond to problems with sewage treatment capacity and related issues which might be identified through an environmental assessment; (2) whether the building permit could be denied, conditioned, or modified to respond to language in the Westwood community plan warning that the intensity of development originally contemplated in that plan should be curtailed unless certain street and highway improvements are completed; and, (3) whether the city employees had the discretion to deny or condition the "consolidation" of the eight lots into one which was accomplished through a lot tie agreement between the city and the developer and which was used to justify more intensive development on certain of the original lots than otherwise would have been permissible. We leave these issues and others to the full evidentiary hearing of the main action.

found, we conclude it is reasonably probable FOW will prevail. Accordingly, we must reverse the denial of a preliminary injunction and order the trial court to grant such relief.[8]

DISPOSITION

The order denying a preliminary injunction is reversed and the cause remanded for further proceedings, including the setting of an appropriate bond for the preliminary injunction, consistent with this opinion.

Lillie, P. J., and Thompson, J., concurred.

Petitions for a rehearing were denied April 27, 1987, and the petitions of all respondents for review by the Supreme Court were denied June 3, 1987.

---

[8]FOW asserted two other independent grounds for reversing the denial of this preliminary injunction. First, it contended the tower's size and configuration exceeded the bulk limitations set forth in the Westwood Village specific plan. Secondly, it contended the alley vacation proceedings were void for failing to require study of the impact of this vacation on the Westwood Village specific plan. Since we order issuance of the preliminary injunction on grounds the approval process for this building permit was a discretionary decision within the meaning of CEQA we need not address these other two independent grounds for granting this same relief. Once again these are issues which can be decided in the main action.

APPENDIX
(Page one)

● FIGURE 9
Major Jobs
plan check flow chart
Department of Building & Safety
page 1

(Page two)

FIGURE 9
Major Jobs
plan check flow chart
Department of Building & Safety
page 2

Because of the poor legibility of these exhibits, the printer has inserted a number over each box, and has printed the text corresponding to the numbers below.

## Page one:

1. Work Sheet
   Rm. 423
   Building & Safety
2. Address & Legal
   Rm. 460
3. Cut Lots &
   Date of Cut
4. City Clerk
   Land Records
   M-76
5. Parcel Maps
   File Lot Split
   Rm. 655
6. If Required
   & Not Done
7. See Counter
   Flow Chart
8. Counter No. 3
   (Public Counter)
9. All Minor Jobs
10. Zoning Counter No. 4
    Rm. 423
11. New Buildings &
    Complex Jobs
12. Planning Rm. 500
    Zone Change
    (if needed)
    May Submit Plans
    if Applicant Signs
    P. C. Fee Waiver
13. Planning - Rm. 655
    Calif. Coastal Zone
    Development Permit
    (Starts 11-27-78)
14. Applicant Leaves
15. Cashier Rm. 402
    Applicant Pays P.C.
    Fee & GPI Fee
16. First Step
17. Rm. 460
    Sewers & Driveways
18. Soil & Geology
    Reports Required
    Post Card Mailed
19. GPI Field Inspection
20. Grading Rm. 421
    GPI & Report
    Submittals
21. Application

22. Counter No. 1
    · Plans Filed &
    Routed - Clerical
    Rm. 423
23. Highway Dedication
    (R-3 Ord.) Rm. 705
24. Applicant Notified
    See R-3 Ord.
    Flow Chart
25. Flood Clearance
    (By Phone)
    City Hall East Rm. 700
26. Critical Soil Rm. 485
    (if no sewer)
27. Field Test if Required
    for Private Sewage
    System Owner Signs
    P.C. Fee Waiver
28. Plan Check
    Plans Logged
    In Rm. 422
29. Single Family Dwellings
    Duplex & Misc. Structure
30. Fire Department Check
    (Apts. & Commercial)
    Rm. 422
31.
    a. Information
    b. Station &
       Operation
    c. Operation
       Only
    d. - - - -    Department Action
    e. — — —    Applicant - normal operation
    f. . . . .    Applicant - special problems
    g. HAAB    Housing and Advisory Appeal Board
    h. BBSC    Board of Building & Safety Commissioners
    i. Prepared by the Graphics Section
       Los Angeles City Planning Department
       for Permit Processing Study Task Force
       Oct. 1978
32. FIGURE 9
    Major Jobs
    plan check flow chart
    Department of Building & Safety
    page 1

Because of the poor legibility of these exhibits, the printer has inserted a number over each box, and has printed the text corresponding to the numbers below.

## Page two:

1. Single Family Dwellings Duplex & Misc. Structure
2. Fire Department Check (Apts. & Commercial) Rm. 422
3. CITY LAWS
   a. Zoning
   b. Building Code
4. Waiting Bins
5. STATE LAWS
   a. Physically Handicapped
   b. Energy
   c. Workman's Compensation
   d. Industrial Safety
   e. Title 19
   f. Seismic Study Zone
6. Plans Checked Post Card Mailed Rm. 422
7. Required Clearances Specified
8. Counter No. 1 Plan Picked Up by. Applicant Rm. 423
9. BBSC Adopt Recommendation or Rehear Case if Appealed
10. HAAB - If Appealed
11. Building & Safety Department Action
12. Approved or Revises Plans
13. Appeals to Dept. of Building & Safety for Modification
14. Applicant Makes Corrections
15. City Planning for Variance or Conditional Use
16. Zoning Counter Rm. 500 Slight Modification or Submit Application
17. Zoning Administration YV, CUZ, CUB, ZAI, or ZV
17a. Approved
18. Revise Plan or Abandoned Project
18a. Denied
19. Appeal Action to BZA
20. Appeal Action to City Council, CUZ, CUB, ZV
21. Applicant Obtains Clearances Per Correction Sheet
22. LIST OF CLEARANCES THAT MAY BE REQUIRED
   a. Fire Dept. LA Code Title 19 Rm. 422
   b. Rm. 101 Dwelling Unit Construction Tax

c. Industrial Safety
d. Flood Rm. 700 City Hall East
e. Landscaping Rm. 500 (over 20 cars)
f. Housing Authority 1533 Wilshire (over 4 units)
g. Legal & Rezone Application
h. Driveway - Rm. 460
i. Address - Rm. 460
j. Coastal Development Permit - Rm. 655
k. Highway Dedication Rm. 705
l. Workman's Compensation
m. Traffic (over 25 cars) Rm. 1200
n. Sewers Rm. 460 or Private Sewage System Rm. 485
o. Plan Approval for Planning Variances Rm. 500
23. PLAN CHECK VERIFICATION
   a. Building & Zoning
   b. State Laws
   c. Required Clearances
   d. Permit Application Approved
   e. Applicant Picks Up Plans
24. If Not Previously Obtained on Application
25. Dept. Set of Plans Filed
26. Rm. 402
27. Cashier Rm. 402 Applicant Pays Building Permit Fees
28. construction begins
29.
   a. Information
   b. Station & Operation
   c. Operation Only
   d. - - - -  Department Action
   e. - - -  Applicant - normal operation
   f. . . . .  Applicant - special problems
   g. HAAB  Housing and Advisory Appeal Board
   h. BBSC  Board of Building & Safety Commissioners
   i. Prepared by the Graphics Section Los Angeles City Planning Department for Permit Processing Study Task Force Oct. 1978
30. FIGURE 9 Major Jobs plan check flow chart Department of Building & Safety page 2