Filed 4/21/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SIERRA CLUB et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF SONOMA et al.,<br><br>　　　Defendants and Respondents;<br><br>RONALD and ERNEST OHLSON, dba<br>OHLSON RANCH,<br><br>　　　Real Parties in Interest and<br>　　　Respondents. | A147340<br><br>(Sonoma County<br>Super. Ct. No. SCV-255465) |

　　　Respondent Agricultural Commissioner of Sonoma County (Commissioner) issued a permit, which we will refer to as an erosion-control permit, under the county's Grading, Drainage, and Vineyard and Orchard Site Development Ordinance (the ordinance) to real parties in interest Ronald Ohlson and his brother, Ernest. The permit allowed them to establish a vineyard on land they own that was being used for grazing. The Commissioner determined that issuing the permit was a ministerial act and therefore exempt from the California Environmental Quality Act, Public Resources Code section 21000 et sequitur (CEQA).[1] Appellants Sierra Club and Center for Biological Diversity (petitioners) challenged the Commissioner's determination by petitioning for a writ of mandate in the trial court. The trial court agreed with the Commissioner and ruled in favor of the Ohlsons.

---

[1] Unless indicated otherwise, all further statutory references are to the Public Resources Code.

We affirm.  Although the ordinance may allow the Commissioner to exercise discretion when issuing erosion-control permits in some circumstances, petitioners fail to show that the Commissioner improperly determined that issuing the Ohlsons' permit was ministerial.  Most of the ordinance's provisions that potentially confer discretion did not apply to the Ohlsons' project, and petitioners fail to show that the few that might apply conferred the ability to mitigate potential environmental impacts to any meaningful degree.

BACKGROUND

Until 2000, grape growers in Sonoma County could plant or replant a vineyard "as a matter of right" without any governmental review or permission.  (Sonoma County Ord. No. 5216, § IV, subd. (b) (Feb. 8, 2000).)  In 2000, the county enacted the ordinance, which governs "grading, drainage improvement, and vineyard and orchard site development within the unincorporated area of the county."[2]  (Ordinance, § 11.02.020.)  The ordinance has been amended over the years, most recently in October 2016.  (Sonoma County Ord. No. 6182.)  We will consider and apply the ordinance as amended in 2012, since this was the version in effect when the Ohlsons' permit was issued.

Article 8 of the ordinance requires growers, other than hobbyists, to obtain an erosion-control permit from the Commissioner before establishing or replanting a vineyard.  (Ordinance, §§ 11.02.030, 11.08.010, subd. A, 11.08.020, 11.10.010, Table 11-4.)  An applicant must submit plans and specifications demonstrating compliance with certain directives and must accept certain ongoing agricultural practices.  The ordinance allows growers to prepare and submit plans for sites with a low erosion risk (Level I sites), but it requires a civil engineer to prepare plans for sites having steeper slopes or a higher erosion risk (Level II sites).  (Ordinance, §§ 11.08.010, subd. B and Table 11-3, 11.10.020, subds. B, C.)

Article 16 of the ordinance sets out the substantive standards for "the proper conduct of grading, drainage improvement, and vineyard and orchard site development."

---

[2] Further references to the ordinance will be in the form "Ordinance, § 11.xx.xxx."

(Ordinance, § 11.16.010.) Some of its directives require the grower to comply with a publication of the Commissioner, "Best Management Practices for Agricultural Erosion and Sediment Control," which is not part of the ordinance itself. A typical example of such a directive is section 11.16.040, subdivision A, entitled "Management of storm water," which states, "Grading and vineyard and orchard site development shall include the drainage improvements or other methods necessary to manage storm water in compliance with the permit authority's best management practices guide."

The Ohlsons' application was filed in October 2013 for a Level II erosion-control permit. The application sought to convert into a vineyard 108 of 132 acres of rangeland.[3] Filed with the application were site maps, a drainage report prepared by a certified engineer, and a biological-resources report. The application indicated that the property included wetland areas and seasonal swales, but no trees or streams. The wetland areas were to be protected by minimum setbacks, as set forth in the biological-resources report, and circular pipe and vee ditch drains were to be installed to drain 27 acres of the property. Erosion was to be controlled through various means, including by using grass avenues (rather than roads), straw mulch, filter strips, and cover crops. According to the drainage report, water runoff was not expected to increase and would be directed to the seasonal swales.

Inspectors for the Commissioner visited the Ohlsons' property in December 2013. The primary review of the Ohlsons' application appears to have been by means of a form checklist containing 69 separate items, some with subparts. These items address whether an applicant submitted the required components of the application, as well as substantive matters such as "[p]rotection fencing for waterways & sensitive areas," "[t]emporary and permanent erosion control measures," "[l]ocation of storm water management and sediment control measures," and "BMP [best management practice] details &

---

[3] The erosion-control permit eventually issued covered only 54 acres. An earlier Level I erosion-control permit appears to have covered the other 54 acres, although this is not entirely clear from the record.

specifications." For each item, the reviewer indicated whether the project "me[t] standards" or alternatively indicated that the item did not apply to the project. In no instance did the Commissioner find the Ohlsons' application to be out of compliance, although some items were not marked either way. In a subsequent list of 10 comments on the application, the Commissioner sought corrections or clarifications to the writings and maps, but it appears no substantive changes were sought.[4] A letter from the Ohlsons' civil engineer confirmed that the requested corrections and clarifications had been made.

The Commissioner approved the permit on December 30, 2013.[5] Several months later, the Commissioner issued a notice declaring that the permit's issuance was ministerial and exempt from CEQA review. The notice stated that "[t]he applicant does not seek changes in the ministerial standards set in [the ordinance] and the Best Management Practices . . . ." It further stated that "the issuance of permits [under the ordinance is a] ministerial action[], except in one situation not applicable here."

The parties agree that CEQA does not require an environmental review for ministerial acts by local agencies. (§ 21080, subds. (a), (b)(1).) Their dispute centers on whether the Commissioner's issuance of the Ohlsons' permit was such a ministerial act. Friends of the Gualala River and the Center for Biological Diversity challenged the permit by filing a petition for a writ of mandate in the trial court. The Sierra Club was added as a petitioner in an amended petition.[6] Following briefing on the merits, the trial court denied the petition in a lengthy written decision. It rejected various procedural arguments raised by the respondents and real parties, but it affirmed the Commissioner's

---

[4] In their opening brief, petitioners claim that these comments were from an engineering firm hired by the Commissioner to review the application. We cannot determine the comments' source from the appellate record, but no one disputes that they were communicated on behalf of the Commissioner.

[5] A separate drainage-improvement permit was apparently issued by the county's Permit and Resource Management Department. That permit has not been challenged in this proceeding.

[6] Friends of Gualala River eventually withdrew from the litigation and is not a party to this appeal.

4

determination that issuing the permit was ministerial and therefore exempt from CEQA review.[7]

DISCUSSION

In their appeal, petitioners continue to maintain that the Ohlsons' permit application was subject to an environmental review under CEQA. Their primary argument is that issuing the permit must have been a discretionary act because many provisions of the ordinance are broad and vague and therefore allow the Commissioner to exercise discretion. We are unpersuaded by this argument because most of the provisions that potentially confer discretion did not apply to the Ohlsons' project, and petitioners fail to show that the few that did apply conferred on the Commissioner the ability to mitigate potential environmental impacts to any meaningful degree. As a result, we must defer to the Commissioner's determination that issuing the Ohlsons' permit was a ministerial act.

A.      *The Initial Determination of CEQA's Applicability.*

"CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)

To ensure that environmental considerations inform public agencies' decisions, CEQA establishes a multi-tiered process. Here, we are concerned with the initial step of the process, which requires the agency to " 'conduct a preliminary review in order to determine whether CEQA applies to a proposed activity.' " (*Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 776 (*Parker Shattuck*).) As part of this review, the agency is to determine whether the activity is a "project" for purposes of

---

[7] We need not address the Ohlsons' various procedural defenses because we affirm the trial court's ruling on the substantive merits.

5

CEQA and, if it is, whether it falls under an exemption. (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907.) There are two types of exemptions: statutory, which are enacted by the Legislature and are not subject to exceptions, and categorical, which are adopted in the regulations developed to guide CEQA implementation (CEQA Guidelines)[8] and are subject to exceptions. (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 850-851.) "If the project is in an exempt category for which there is no exception, ' "no further environmental review is necessary." ' " (*Parker Shattuck*, at p. 776.) If the project is not exempt, the agency proceeds to the other tiers of the CEQA process, which involve the preparation of an initial study and, if appropriate, an environmental impact report (EIR). (*Ibid.*)

      *B.*     *The Ministerial Exemption.*

CEQA applies only to "discretionary projects proposed to be carried out or approved by public agencies." (§ 21080, subd. (a).) The statute correspondingly exempts "[m]inisterial projects" (*id.*, subd. (b)(1)), a term that has been assumed to refer to projects that are not discretionary.[9] CEQA itself does not define either term, but both are defined in the Guidelines. Under Guidelines section 15357, a discretionary act is one that "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." Under Guidelines section 15369, a ministerial decision is one "involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or

---

[8] California Code of Regulations, title 14, section 15000 et sequitur. CEQA Guidelines will hereafter be cited in the form "Guidelines, § xxxxx."

[9] The original version of section 21080 was enacted, with the remainder of CEQA, in 1972. (See 1972 Stats., ch. 1154, § 2.6, p. 2272.) As initially enacted, section 21080 contained only one exemption, subdivision (b), which stated, "This division shall not apply to ministerial projects proposed to be carried out or approved by public agencies."

judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out." If a project approval features both ministerial and discretionary elements, the project is deemed discretionary and subject to CEQA review. (Guidelines, § 15268, subd. (d).)

Our state Supreme Court has explained the legislative rationale behind CEQA's exclusion of ministerial actions: "The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117.) As further explained in *Leach v. City of San Diego* (1990) 220 Cal.App.3d 389, " 'To properly draw the line between "discretionary" and "ministerial" decisions . . . , we must ask why it makes sense to exempt the ministerial ones from the EIR requirement. The answer is that for truly ministerial permits an EIR is irrelevant. No matter what the EIR might reveal about the terrible environmental consequences of going ahead with a given project the government agency would lack the power (that is, the discretion) to stop or modify it in any relevant way. The agency could not lawfully deny the permit nor condition it in any way which would mitigate the environmental damage in any significant way.' " (*Id.* at p. 394; see also *Central Basin Municipal Water Dist. v. Water Replenishment Dist. of Southern California* (2012) 211 Cal.App.4th 943, 949 ["CEQA does not apply to ministerial actions—actions in which the agency is not permitted to shape the process to address environmental concerns"].) Consistent with this understanding, the Guidelines recognize that "[w]hether an agency has discretionary or ministerial controls over a project depends on the authority granted by the law providing the controls over the activity. Similar projects may be subject to discretionary controls in one city or county and only ministerial controls in another." (Guidelines, § 15002, subd. (i)(2); see *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1014-1015.)

The first appellate case to discuss the ministerial exemption was *People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 (*Department of Housing*), in which the court considered whether a construction permit to develop a mobilehome park, required by the State Department of Housing and Community Development under the Mobilehome Parks Act (MPA), was ministerial or discretionary.[10] (*Id.* at p. 192.) Rejecting the department's determination that the permit's issuance was ministerial, the court held that the approval was "neither wholly ministerial nor entirely discretionary" and therefore required CEQA review. (*Id.* at pp. 193-194.) The court based its conclusion that the approval was partially discretionary on the MPA's building standards, which used imprecise adjectives to define compliance, and on a provision in the act that permitted a conditional permit: "A third class of standards is relatively broad, relatively general. The applicant for a mobilehome construction permit must submit a 'description of the water supply, ground drainage and method of sewage disposal.' [Citation.] There must be a 'sufficient' supply of artificial lighting. [Citation.] The water supply must be 'adequate' and 'potable.' [Citation.] The site must be 'well-drained and graded.' [Citation.] Instead of an unqualified construction permit, the enforcement agency may issue a conditional permit which prescribes ongoing conditions on use or occupancy." (*Id.* at p. 193.) As the court explained, "[w]hether the water supply is adequate and potable; whether sewage disposal is satisfactory; whether the site is well-drained and graded; whether lighting is sufficient; whether sub-optimum features call for use and occupancy restrictions—these are relatively personal decisions addressed to the sound judgment and enlightened choice of the administrator. These decisions may have great environmental significance relative to one physical site,

---

[10] When *Department of Housing* was decided, the section of the Guidelines defining discretionary projects was nearly identical to its current version, but the ministerial definition was somewhat less rigid. Rather than referring to "fixed standards or objective measurements," the Guidelines recognized that " 'the statute, ordinance, or regulation may require, in some degree, a construction of its language by the officer.' " (*Department of Housing, supra*, 45 Cal.App.3d at p. 190, fn. 1, quoting former Guidelines, § 15032.)

negligible significance in another. Inevitably they evoke a strong admixture of discretion." (*Ibid.*)

Courts continue to recognize that actions by a local agency are discretionary when they require the exercise of the administrator's subjective judgment and are ministerial when they are taken under regulations that allow for little or no exercise of such judgment. As Division Four of this court summarized, a permit is ministerial if "[t]he fixed approval standards delineate objective criteria or measures which merely require the agency official to apply the local law . . . to the facts as presented in a given . . . application. [Citation.] The approval process is one of determining conformity with applicable ordinances and regulations, and the official has no ability to exercise discretion to mitigate environmental impacts." (*Sierra Club v. Napa County Board of Supervisors* (2012) 205 Cal.App.4th 162, 180 (*Sierra Club*).)

The Commissioner characterizes the holdings in *Department of Housing* and similar early cases as "outdated" and "superseded" by *Sierra Club* and *Friends of the Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 302 (*Juana Briones House*). According to the Commissioner, a regulation is now viewed as granting discretion only if it does not establish an objective rule for decision by the local agency. We are not persuaded. The applicable Guidelines have not changed in decades, and we find nothing in *Sierra Club* or *Juana Briones House* to support the notion that the analysis has been altered for evaluating whether an action was ministerial. In *Juana Briones House*, the court cited the traditional standard from Guidelines section 15369 requiring "fixed standards or objective measurements" and quoted the observation in *Department of Housing* that a permit is ministerial only if " 'the official decision of conformity or nonconformity leaves scant room for the play of personal judgment.' " (*Juana Briones House*, at p. 300.) Similarly, *Sierra Club* determined a permit's issuance is ministerial if "[t]he fixed approval standards delineate objective criteria or measures which merely require the agency official to apply the local law . . . to the facts as presented in a given . . . application." (*Sierra Club, supra*, 205 Cal.App.4th at p. 180.)

9

This is essentially a restatement of the standard in Guidelines section 15369. Thus, in our view, *Department of Housing*'s holding remains good law.

An important elaboration of the analysis for evaluating whether an action was ministerial was announced in *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259 (*Friends of Westwood*), and it is known as the "functional test." (*Juana Briones House, supra*, 190 Cal.App.4th at p. 302.) In *Friends of Westwood*, the court ruled that a city's issuance of a building permit to construct a 26-story office tower was discretionary. (*Friends of Westwood*, at pp. 262-263, 274-275.) In reaching its ruling, the court adopted a "functional distinction" between discretionary and ministerial acts, explaining, "[T]he question here is whether the city had the power to deny or condition this building permit or otherwise modify this project in ways which would have mitigated environmental problems an EIR might conceivably have identified. If not, the building permit process indeed is 'ministerial' within the meaning of CEQA. If it could, the process is 'discretionary.' . . . It is enough the city possesses discretion to require changes which would mitigate in whole or in part one or more of the environmental consequences an EIR might conceivably uncover." (*Id.* at p. 273, italics omitted.)

Following *Friends of Westwood*, courts recognize that " 'CEQA does not apply to an agency decision simply because the agency may exercise some discretion in approving the project or undertaking. Instead[,] to trigger CEQA compliance, the discretion must be of a certain kind; it must provide the agency with the ability and authority to "mitigate . . . environmental damage" to some degree.' " (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 934, italics omitted; see also *Juana Briones House, supra*, 190 Cal.App.4th at p. 308 [permit is discretionary if agency "has [the] authority to condition the permit in environmentally significant ways"].)

C.      *Standard of Review.*

Our review is de novo in the sense that "our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial

10

court's decision." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381 (*Muzzy Ranch*); *Parker Shattuck, supra*, 222 Cal.App.4th at p. 778.)

The standard of review applicable to an agency's decision under CEQA depends on the nature of the action being reviewed and when in the multi-tiered process it occurred. Here, we are reviewing the Commissioner's determination, made in the initial step of the three-tiered process, that issuing the Ohlsons' permit was exempt from CEQA review because the action was ministerial. We generally review an agency's determination that an activity falls under the ministerial exemption for " 'a prejudicial abuse of discretion.' " (*Muzzy Ranch, supra*, 41 Cal.4th at p. 381, quoting § 21168.5; *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Guidelines section 15268, subdivision (a) makes clear that "[t]he determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as a part of its implementing regulations or on a case-by-case basis." (See *Friends of Davis v. City of Davis, supra*, 83 Cal.App.4th at p. 1015; see also *Sierra Club, supra*, 205 Cal.App.4th at p. 178.)

To the extent an agency's determination that an activity is exempt involves factual determinations, we review those determinations for substantial evidence. (See, e.g., *Save Our Carmel River v. Monterey Peninsula Water Management Dist., supra*, 141 Cal.App.4th at p. 694.) And to the extent the agency's determination that an activity is exempt involves pure questions of law, we review those questions de novo. (*Juana Briones House, supra*, 190 Cal.App.4th at p. 303; *Prentiss v. City of South Pasadena* (1993) 15 Cal.App.4th 85, 89.)

*D.* *The Commissioner's Determination that Issuing the Erosion-control Permit Was Ministerial Involved No Prejudicial Abuse of Discretion.*

With this standard of review in mind, we turn to consider the Commissioner's determination that issuing the Ohlsons' permit was a ministerial act.  We begin by pointing out that the ordinance itself categorically declares that issuing erosion-control permits is ministerial, except when an application seeks exceptions from the established standards.  (Ordinance, §§ 11.10.020, subd. E, 11.10.060.)[11]  Because, as we discuss below, a determination whether issuing a permit is ministerial or discretionary generally must be made on the basis of the project's particular circumstances, we are skeptical of such a categorical declaration.  But we need not decide here whether the declaration is always binding—i.e., whether the issuance of every erosion-control permit is necessarily ministerial unless an exception is sought—because petitioners have not shown that any provisions that arguably grant discretion actually apply to the Ohlsons' application so as to refute the Commissioner's determination that issuing the permit was ministerial.

Petitioners argue that issuing an erosion-control permit is always a discretionary act because provisions in the ordinance establish "vague, subjective standards that require County personnel to use deliberation and personal judgment to determine whether and how vineyard developments should be carried out."  Petitioners argue, for example, that a provision governing "[c]uts and fills" states that cuts and fills shall be "limited to the amount necessary for the intended use," be graded "to achieve a consistent grade and

---

[11] When the immediate precursor of the 2012 ordinance was enacted in 2008, the Board of Supervisors passed a resolution expressing its goal of establishing a permitting process that was ministerial and exempt from CEQA review:  "The application of CEQA to grading drainage improvement, and vineyard and orchard site development could result in inappropriate and burdensome delays of lawful activities in the county . . . . Accordingly, the Board of Supervisors declares its intention, in adopting the [ordinance,] . . . to achieve certain environmental protections while, at the same time, creating a ministerial system of regulation that is consistent with the current practices of the county . . . and does not unduly complicate and discourage grading, drainage improvement, and vineyard and orchard site development activities."  (Sonoma County Ord. No. 5819, § XIV, subd. (b) (Dec. 9, 2008).)

natural appearance," and have slope tops rounded "to blend with the natural terrain." (Ordinance, § 11.16.020, subds. A.1, 2, 2.a.)  Other provisions require storm water to be diverted to "the nearest practicable disposal location," a method of soil storage that "shall not cause damage to root systems of trees intended to be preserved," and "suitable stabilization measures" to protect against a loss of topsoil during grading activities. (Ordinance, §§ 11.16.040, subd. D, 11.16.090, subds. A, B.)  According to petitioners, these and a number of other provisions demand the exercise of discretion because they contain insufficiently precise standards for compliance.[12]

1.    Most of the ordinance's provisions that potentially confer discretion on the Commissioner did not apply to the Ohlsons' permit.

We need not decide whether most of the provisions cited by petitioners confer discretion on the Commissioner because they did not apply to the Ohlsons' application. The relevant question in evaluating whether the approval of a particular project was discretionary is not whether the regulations granted the local agency some discretion in the abstract, but whether the regulations granted the agency discretion regarding the particular project.  In other words, a regulation cited as conferring discretion must have been relevant to the project.

_____

[12] The other specific provisions cited by petitioners are Ordinance sections 11.16.020, subdivisions C.8 & 9 [no fill may be used "unless an analysis demonstrates that no adverse impact to drainage . . . will result from the fill placement and related improvements"], 11.16.120, subdivision C [fills within watercourses "shall have protection against soil loss"], 11.16.140 [setbacks from a lake are 50 feet unless the grading "will not compromise the structural integrity of the lake"], and best management practices nos. 1.2 ["[A]void disturbing any areas with landslides, gullies and slips"], 1.4 ["[I]ncorporate structural erosion control systems to intercept and diffuse water flow . . . to prevent excess sediment from entering streams"], 1.6 ["Avoid planting in frost-prone areas"], 2.7 ["Out-slope roads wherever possible"], 2.11 ["Remove stream crossings wherever possible"], 2.12 ["Replace culverts, fords, or Humboldt crossings with single span bridges where possible"], 3.3 ["Whenever possible, avoid tilling early in the spring or late in the fall"], 3.4 ["Minimize tillage practices" if slopes erodible], 4.2 ["Incorporate natural drainage features . . . whenever possible"], and 5.6 ["Leave downed trees in the riparian corridor"].

This point was made in *Prentiss v. City of South Pasadena, supra*, 15 Cal.App.4th 85, in which the petitioners challenged a city's conclusion that issuing a building permit to alter a historic building was ministerial. (*Id.* at p. 86.) Under state law governing historical structures, the building owner could have sought a permit to alter the building in various ways that did not comply with local building codes. The owner made no attempt to take advantage of this provision, however, and submitted plans in full compliance with local ordinances. The petitioners argued that issuing the permit was discretionary because the city could have exercised discretion under state law to permit a departure from those ordinances. *Prentiss* rejected that argument because the city had not exercised any state-law discretion that may have been available to it. As the court explained, "[t]he fact that discretion could conceivably be exercised in projects arising under the State Historical Building Code does not mean that *respondents'* project was discretionary." (*Id.* at p. 97.)

The principle that a discretion-conferring provision must have been relevant to the project grows directly out of CEQA's focus on individual projects. (§ 21080, subd. (a) [CEQA applies to "projects"].) Our review is directed not to the regulations themselves but to the agency's action in approving the project under those regulations. Thus, any regulation cited as granting discretion to the agency must actually have applied to the project under review. If it did not, the agency could not have exercised discretion under that regulation in approving the project.

Some of the provisions cited by petitioners were facially inapplicable to the Ohlsons' application. For example, Ordinance section 11.16.020, subdivision C.8 regulates the use of fill "in [a] flood-prone urban area." This provision was obviously inapplicable since the Ohlsons' property is in a remote agricultural area. Similarly, the many regulations cited by petitioners concerning the treatment of watercourses, lakes, and trees were inapplicable because the Ohlsons' property has no such features.[13]

---

[13] Specifically, Ordinance sections 11.16.120 and 11.16.140 and best management practices nos. 1.4, 2.11, 2.12, and 5.6.

14

Other provisions cited by petitioners, while facially applicable, involved activities the Commissioner expressly excluded in considering the Ohlsons' application. Many of these provisions concerned cuts, fills, and other aspects of grading.[14] "Total volume of cuts," "total volume of fills," and "acres to be graded" were all marked as "not applicable" in the application, which was approved without material modification.[15] In the same vein, best management practice no. 2.7 governs roads, but the Ohlsons' property will have no roads and will instead have grass-covered avenues. And Ordinance section 11.10.020, subdivision B requires an applicant to submit "any reports and studies necessary to verify compliance with the standards in article 16 (e.g., hydrology study, hydraulic analysis, compaction report, geotechnical or soils report, liquefaction study, wetlands assessment, wetlands delineation)," but contrary to petitioners' suggestion otherwise, this provision did not give the Commissioner discretion either to require reports for conditions that were not present or to excuse reports for conditions that were present. Nor have petitioners cited anything in the record that points to any condition on the Ohlsons' property that triggered an unmet need for some other report.

Finally, many of the best management practices petitioners cite applied to ongoing vineyard operations, and there is no evidence in the record to suggest that they played any role in issuing the Ohlsons' permit. These included directives for growers to avoid planting in frost-prone areas (no. 1.6), to avoid tilling early in the spring or late in the fall (no. 3.3), to minimize tillage on erodible slopes (3.4), to leave downed trees in the

---

[14] Specifically, Ordinance sections 11.16.020, subdivisions A.1, A.2, A.2a, C.8, and C.9, 11.16.040, subdivision D, and 11.16.090, subdivision A, and best management practice no. 1.2.

[15] The Commissioner states that the provisions governing cuts and fills were inapplicable to this application because the Ohlsons had already obtained a grading permit with respect to the property. We find no confirmation of this assertion in the record, but it is immaterial. The Commissioner effectively found these provisions to be inapplicable by approving the application, which listed them as inapplicable. Petitioners present nothing to suggest that the provisions played any actual role in the consideration of the Ohlsons' application.

riparian corridor (5.6), and to minimize tilling on erodible slopes (no. 3.4). None of these topics was included on the Commissioner's approval checklist.[16]

In short, most of the provisions cited by petitioners as conferring discretion on the Commissioner were inapplicable to the Ohlsons' project and do not refute the Commissioner's determination that issuing the Ohlsons' permit was ministerial. We decline petitioners' invitation to hold that the issuance of erosion-control permits is always discretionary, even in cases in which no discretion-conferring provision applies, simply because provisions conferring discretion are present in the ordinance.

> 2. Nothing in the language of the three potentially applicable provisions that arguably confer discretion or in the record indicates that the Commissioner was able to mitigate potential environmental impacts to any meaningful degree.

After eliminating inapplicable provisions, only three provisions remain that were potentially material to the Ohlsons' permit: one requiring a 50-foot setback from wetlands "unless a wetlands biologist recommends a different setback" (Ordinance, § 11.16.150, Table 11-7), another requiring storm water to be diverted "to the nearest practicable disposal location" (Ordinance, § 11.16.040, subd. D), and a third requiring the applicant to "[i]ncorporate natural drainage features . . . whenever possible" (best management practice no. 4.2).

Petitioners argue that the language of these provisions is general enough to confer discretion. But even assuming we could interpret these provisions to grant some discretion to the Commissioner, we reject petitioners' argument that this alone requires us to hold that the Commissioner's issuance of the Ohlsons' permit was a discretionary act.

_____

[16] Similarly, petitioners contend that the ordinance confers discretion because it permits the Commissioner to conduct post-application inspections and to require professional certifications to insure work is performed in accord with approved plans. But these provisions pertain only to compliance with a permit; they have nothing to do with whether the Commissioner exercised discretion in issuing the permit in the first instance.

The argument ignores the principle, arising out of the functional test, that " 'CEQA does not apply to an agency decision simply because the agency may exercise some discretion in approving the project or undertaking. Instead[,] to trigger CEQA compliance, the discretion must be of a certain kind; it must provide the agency with the ability and authority to "mitigate . . . environmental damage" to some degree.' " (*San Diego Navy Broadway Complex Coalition v. City of San Diego, supra*, 185 Cal.App.4th at p. 934, italics omitted.) For the reasons discussed above, the existence of discretion is irrelevant if it does not confer the ability to mitigate any potential environmental impacts in a meaningful way. (See also *Johnson v. State of California* (1968) 69 Cal.2d 782, 788 [" '[I]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail' "].)[17]

We recognize that some older decisions treated the mere existence of discretion as conclusive, without expressly discussing its meaningfulness in the context of the particular project approval. In those decisions, however, such a discussion was unnecessary because the scope of the discretion granted was obviously meaningful. In *Department of Housing*, for example, the agency had broad discretion with respect to the water supply, drainage, and method of sewage disposal at the site, and it could issue a conditional permit imposing a variety of conditions on use and occupancy. (*Department of Housing, supra*, 45 Cal.App.3d at p. 193.) There was no question that such broad authority conferred on the agency the power to influence the project's environmental

---

[17] It is worth pointing out that adopting petitioners' argument would have the perverse effect of discouraging agencies from enacting ordinances, such as the ordinance here, specifically designed to mitigate environmental impacts through a permitting process. Under petitioners' view of the law, if an agency has *any* discretion under the language of such an ordinance it cannot determine that issuing a permit is ministerial, even if there is nothing to suggest that the discretion allows the agency to further mitigate potential environmental impacts to any meaningful degree. If this were the law, agencies would be motivated to avoid CEQA burdens by simply not enacting such ordinances in the first place.

17

impact.  Similarly, *Friends of Westwood* involved the discretionary approval of a 26-story building in a crowded urban area (*Friends of Westwood, supra*, 191 Cal.App.3d at p. 262), and *Day v. City of Glendale* (1975) 51 Cal.App.3d 817 (*Day*) considered the approval of a grading permit "to fill canyons . . . with 1,556,000 cubic yards of material . . . and movement of 343,000 cubic yards of material to be cut from a ridge to form a [huge] notch" as part of a highway construction project.  (*Id.* at pp. 819-820.)  Again, there was no question that the discretion involved in approving both of these large projects allowed for environmentally meaningful mitigation.

The contrast between those circumstances and the Ohlsons' project is dramatic.  First, and most importantly, in contrast to the significant discretion granted to the agencies in those cases, the Commissioner's consideration of the Ohlsons' application was confined by a series of finely detailed and very specific regulations.  The substantive provisions in article 16 of the ordinance run to 17 pages in the administrative record and the best management practices add a further 36 pages, covering a wide range of circumstances and prescribing specific measures to address them.  While these provisions may grant some discretion, the scope of any such discretion is drastically narrower than that which was conferred by the broad language of the regulations in *Department of Housing*, *Day*, and *Friends of Westwood*.  In addition, the provisions here are technical.  A provision that appears to a lay person to grant discretion to an agency might, as understood by a person with technical knowledge, grant little or none in the context of a particular proposed project.

Turning to examine the three specific provisions that potentially conferred discretion on the Commissioner, we are mindful of the applicable standard of review, which requires us, as we have mentioned, to review the Commissioner's determination that issuing the Ohlsons' permit was a ministerial act for " 'a prejudicial abuse of discretion.' " (*Muzzy Ranch, supra*, 41 Cal.4th at p. 381, quoting § 21168.5.)  Such an abuse is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)  In applying this standard, we must be attentive to the directive of Guidelines section 15268,

18

subdivision (a), that "[t]he determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based on its analysis of its own laws." *Sierra Club* rejected the argument that a county's finding that its action was ministerial was not entitled to judicial deference, stating, "[S]urely that is not the law. Otherwise, why would the governing regulations acknowledge that the local public agency is the most appropriate entity to determine what is ministerial, based on analysis of its own laws and regulations, and urge that the agency make that determination in *its* implementing regulations?" (*Sierra Club, supra*, 205 Cal.App.4th at p. 178.)

The first provision that potentially conferred discretion requires a 50-foot setback for wetlands unless a wetlands biologist recommends a different setback. (Ordinance, § 11.16.150.) Petitioners point out that the Commissioner relied on this provision in accepting a 35-foot setback for the Ohlsons' permit. In a report submitted with the Ohlsons' application, a wetlands biologist stated that a 35-foot setback was sufficient because the slopes would be covered with vegetation and because cattle grazing, which had damaged the wetlands, would be eliminated. The provision required the Commissioner to allow the 35-foot setback in the absence of some reason to reject the biologist's report. As the trial court put it, "[a]lthough the details for the size of any setback for undesignated wetlands are left open, the qualification is itself ministerial because the Ordinance provides that the setback will be whatever a wetlands biologist recommends. The actual size of the setback is not set, but the requirement to accept a biologist recommendation is set." Petitioners point to nothing demonstrating that the Commissioner had discretion under this provision or, even assuming there was some discretion, could mitigate potential environmental impacts to any meaningful degree.[18]

_____

[18] In supplemental briefing requested by this court, petitioners argue at length that the Ohlsons' project has the potential to have significant environmental impacts. This misses the point. We assume that establishing a vineyard has the potential to cause such impacts. The purpose of the ordinance, in fact, is to control those impacts. The pertinent issue is whether the ordinance gave the Commissioner discretion to further mitigate the

19

The second provision that potentially conferred discretion requires the diversion of storm water to the nearest practicable disposal location. The Ohlsons' application stated that the vineyard would not result in any increase in water runoff and that rain water would move by surface sheet flow to vee ditches, which in turn would drain into storm drains. By failing to demonstrate that other means of diversion were even available, petitioners have not established that the Commissioner had discretion under this provision. And even assuming there was some discretion, petitioners fail to show that it allowed the Commissioner to mitigate potential environmental impacts to any meaningful degree.[19]

As to the third provision that potentially conferred discretion, the best management practice requiring the incorporation of natural drainage features "whenever possible," petitioners make no attempt to demonstrate what type of natural drainage features were present on the Ohlsons' property. By not identifying any alternative natural

---

impacts of the Ohlsons' project to any meaningful degree, and petitioners fail to demonstrate that it did.

[19] In their supplemental briefing, petitioners point out that the procedural mechanism for judicial review here, an action for traditional mandamus under Code of Civil Procedure section 1085, generally precludes the introduction of evidence outside the administrative record to demonstrate the potential for mitigation of a project's environmental impacts. Because petitioners never attempted to introduce such evidence in this proceeding, the issue is not before us. We note, however, that while "the well-settled *general* rule [is] that extra-record evidence is inadmissible in traditional mandamus actions challenging quasi-legislative administrative decisions" (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1445), that general rule does not apply in actions to challenge ministerial or "informal" actions. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575-576.) As explained in *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, "Administrative actions that do not involve public hearings . . . are generally considered ' "informal." ' [Citations.] Thus, because the record upon which a public agency's informal action is based is often inadequate to permit meaningful review, the court presiding over traditional mandamus proceedings challenging the agency's informal action is generally permitted to consider extra-record evidence." (*Id.* at p. 255; see also *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 238.)

drainage features, petitioners again fail to show that the Commissioner had discretion under this provision. And even assuming there was some discretion, petitioners do not demonstrate that it allowed the Commissioner to mitigate potential environmental impacts to any meaningful degree.

> 3. The Commissioner's ability to request additional voluntary actions does not refute the determination that issuing the Ohlsons' permit was ministerial.

Finally, petitioners argue that the issuance of the Ohlsons' permit was discretionary based on two requests the Commissioner made before approving the application. The Commissioner required as a condition of the permit several mitigation measures that the Ohlsons adopted in their engineering plans. But because the ordinance does not require these measures, as petitioners concede, the Commissioner had no authority to require them. The Ohlsons' acceptance of them, therefore, did not establish an exercise of discretion by the Commissioner. (See *Juana Briones House, supra*, 190 Cal.App.4th at p. 309 [conditions voluntarily accepted by a permit applicant but not required under the applicable ordinance did not render the permit discretionary].) We decline to hold that the issuance of a permit, otherwise ministerial, is rendered discretionary and therefore subject to further CEQA review because the applicant offers to mitigate potential impacts in ways that are not required.

Petitioners also contend that the Commissioner's request for corrections to and clarifications of the Ohlsons' application demonstrates discretion because the Ohlsons could not have compelled issuance of the permit without making those changes. In so arguing, petitioners rely on *Friends of Westwood*'s observation that a project is ministerial "[o]nly when a private party can *legally compel* approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Friends of Westwood, supra*, 191 Cal.App.3d at p. 267.) But the simple fact that an agency asks for more information does not establish that the applicant must provide that information before the applicant can compel issuance of the permit. Moreover,

21

petitioners fail to show that the corrections and clarifications made were significant enough to possibly "alleviate adverse environmental consequences." (*Ibid.*)

In sum, we cannot conclude on this record that the Commissioner's determination that issuing the Ohlsons' erosion-control permit was a ministerial act constituted a prejudicial abuse of discretion.

## DISPOSITION

The judgment of the trial court is affirmed. Respondents may recover their costs on appeal. (Cal. Rules of Court, rule 8.278, (a)(1), (2).)

_____

Humes, P.J.

We concur:

_____

Margulies, J.

_____

Banke, J.

*Sierra Club v. County of Sonoma* (A147340)

22

Trial Court:

     Sonoma County Superior Court


Trial Judge:

     Hon. Gary Nadler


Counsel for Plaintiffs and Appellants

     Mark R. Wolfe; M.R. Wolfe & Associates, P.C. (Sierra Club)

     Justin Augustine; Center for Biological Diversity


Counsel for Defendant and Respondents:

     Bruce D. Goldstein; County Counsel

     Jeffrey M. Brax; Chief Deputy Counsel


Counsel for Real Parties in Interest and Respondents:

     Arthur F. Coon, Matthew C. Henderson; Miller Starr Regalia

     Thomas R. Passalacqua; Passalacqua, Mazzoni, Gladden, Lopez, and Maraviglia


*Sierra Club v. County of Sonoma* (A147340)